In the matter of the probate of the alleged will of JULIUS HEIM, deceased.

HOWARD HEIM, CHARLES HEIM, HARRIET HEIM, ADELINE BUTTERFIELD, IRMA SCHULTZ and JEANETTE HEIM, respondents-appellants,

*v.*

FREDERICK E. BAUER, appellant-respondent.

[Argued October 24th, 1944. Decided January 4th, 1945.]

*Messrs. Drewen & Nugent (Mr. John Drewen),* for the proponent of the will.

*Mr. Joseph Keane, Messrs. Milton, McNulty & Augelli, Mr. Kenneth J. Dawes* and *Mr. Constantine Donato,* for those opposing probate.

The opinion of the court was delivered by

CASE, J.

Julius Heim, ninety years of age, died October 29th, 1942, in the North Hudson Hospital whither he had been taken on July 14th, preceding. A will was produced for probate by Frederick E. Bauer, respondent herein, an attorney-at-law of Union City, who had taken the data for the instrument on said July 14th, drawn and supervised the execution of the document on July 15th and was given, by the terms thereof, the entire estate of nearly $90,000 except decedent's realty— several lots in Union City, containing some dilapidated and almost untenantable houses, of the gross value of approximately $6,000. Heim, a widower, had lived alone in one of his houses. He was survived by a brother and a sister (Mr. Charles Heim and Mrs. Adeline Butterfield) who lived in California, by another sister (Mrs. Pauline Roggenbrodt) who lived in Union City and by children of deceased brothers and sisters. All of the next of kin, except one, challenged the validity of the will upon two grounds, (1) that the tes-

tator was incompetent, and (2) that the will was procured through the fraud and undue influence of the scrivener and favored legatee. Probate was allowed by the surrogate of Hudson County. On appeal, the Hudson County Orphans Court referred the matter to a master to take testimony and report. The master's report, confirmed after the filing of exceptions, found that Heim lacked testamentary capacity on July 15th, 1942, and that the disputed instrument was procured by undue and illegal influence exerted upon him by Bauer. The decree of the Orphans Court setting aside the probate was appealed to the Prerogative Court and there reversed. We have the Prerogative Court decree re-establishing the probate before us for review.

We shall first state the fundamental legal principles regarding presumptions and burden of proof and then weigh the proofs upon those principles.

Where testamentary incapacity is alleged to arise from physical condition and mental derangement depending thereon, the burden of proving the incompetency is upon the contestants. *In re McKinney's Estate, 86 N. J. Eq. 211.*

The burden of proving undue influence to execute a will rests upon him who alleges it; but, while such burden does not shift merely because of the existence of a confidential relationship, without more, nevertheless other facts added thereto, as for example, that the testator's mentality was so enfeebled that it could not well resist improper influence, or solicitude and action on the part of the dominant mind to see that the will was prepared and executed, or an arrangement for the presence of particular testamentary witnesses, or some such self-serving and suspicious element, will cause the burden to shift. *In re Neuman, 133 N. J. Eq. 532.* And beyond that, where the person to whom the burden has shifted is an attorney-at-law and the will is drawn by him in his capacity as attorney and legal adviser to the testator and in his own favor, we think that the testimony required to countervail the presumption should be impeccable and convincing; a standard applied by Vice-Chancellor Backes in *In re Morrisey's Will, 91 N. J. Eq. 480,* to persons occupying a confidential relationship even though not of professional origin.

Upon those rules and the facts stated and yet to be stated, we find that a presumption of undue influence arose and that the burden of proof thereon was shifted to the respondent herein; and respondent concedes that he is properly charged with the burden upon that issue.

On June 26th, 1942, Charles Lincoln Heim, a nephew of the testator, in the habit of visiting the latter every two weeks, received a postcard from one Frank Bakgardt (said to be Balgaretti) of 510 Eighth Street, Union City, stating that Julius Heim wished to see him on a "very important" matter. Charles went to his uncle that afternoon. His testimony was that Julius was alone in the house, in bed, fully dressed even as to shoes and overcoat, and the bed was in "terrible" condition from excrement. Julius was incoherent, and failed to recognize the witness. Charles again, on Sunday, July 12th, called upon Julius, and his testimony with regard to that visit was that there was the same physical and mental condition on the part of Julius and a like condition of filth of the bed (then extended to the floor) ; that Julius had one stocking and one shoe on and one stocking and one shoe off, but otherwise was fully clothed, including overcoat, with many bedclothes over him although the day was hot, the windows closed and the house stifling; that Julius was lying with his face toward the wall; that the witness shook him without response, raised him up in bed and said, "Uncle Julius, this is Charlie," but got no recognition; that the sick man mumbled and made rambling, inept remarks not in accord with the facts. The witness was there for two hours and throughout that time was not recognized by his uncle.

On three different occasions during the first half of July, 1942, police cars were summoned to the Heim house. Officer Cereghino testified that in the "early part of July" he was in a radio patrol car and received the call from headquarters. He went with his companion officer and saw Heim and also a neighbor, a young Italian woman named Millie Balgaretti. Heim was in bed with his clothes on. The house was upset and very dirty. The bed was soiled by bowel movements. The witness asked Heim what the matter was and got no answer. He asked Heim if he was sick and got no answer.

Miss Balgaretti asked the officers to get Heim to the bathroom. They did that and brought him back to the bed and left. And Heim, whom the witness knew, said nothing to them during the entire time.

Officer Smith testified that he, too, was dispatched by radio from headquarters, about July 7th, to Heim's home. He found Heim lying on the floor, dressed in long underwear, alongside the bed. No one else was in the house. The witness was there about twenty minutes. He questioned Heim but without response—"could not get any information at all from him"—"no answer at all." The witness, with his companion officer, put Heim back in bed. The witness saw one of Mr. Bauer's business cards, showing telephone number, lying on the table. He telephoned to the number and was asked to try to get Heim to go to the hospital and replied, "I cannot get any information whatever out of the man."

Officer Shatajian, with a fellow officer, while in a radio car on July 11th, 1942, received a like call and was instructed to investigate; "they figured it was a sick call, so they wanted to find out whether it would be an ambulance job." The officers found Heim fully clothed, lying in the bathtub. There was no water in the tub. They were in the house about fifteen minutes and tried to talk with Heim but were unable to get an answer. So they lifted Heim out of the tub and placed him in a chair. Millie Balgaretti was there at the time.

Mrs. Anna Roggenbrodt is the wife of William Roggenbrodt, who is the son of Pauline Roggenbrodt (sister to the decedent and one of those who contested the probate). Mrs. Anna Roggenbrodt, to whom, along with her husband, the will left an interest in the real estate in trust for her son, was put on the stand as a witness for the proponent of the will. She testified that on July 13th she received a telephone message from Millie Balgaretti stating that Mr. Heim was lying on the floor; that the witness and her husband went to the house and told Mr. Heim that he should go to the hospital, and she heard Mr. Heim say that "he wanted to settle up his affairs," whereupon the witness said, "Shall I call Mr. Bauer?" that Mr. Heim said, "Yes," and that the witness

got Bauer on the telephone and the witness' husband "explained that Uncle Jule had consented to go to the hospital and he wanted to settle up his affairs, and would Mr. Bauer please make arrangements to come over," whereupon an engagement was made for the following day; that the next day Mrs. Roggenbrodt was there when Bauer came; that Bauer said to Mr. Heim, "You have sent for me to come and take care of your affairs," to which Mr. Heim said, "Yes;" that Bauer said, "I felt you should have been in the hospital long before this," and Mr. Heim said, "Well, he was ready to go, he felt he should go." The testimony of the witness continues: "And it was then that Mr. Bauer said, 'Mr. Heim,' he said, 'We all some day have to be prepared to meet our Maker,' and he said he felt he should make a will. And Uncle Jule said, 'Yes, he wanted to;'" that Mr. Heim gave directions about the real estate. "And he [Bauer] said, 'What about what is left?' And Uncle Jule said, 'Oh,' he said, 'There is not very much,' and Mr. Bauer said, 'Well,' he said, 'Here is a bank statement, a checking account statement'—this was lying on his bed, $14,000 and some odd dollars, he said, 'Mr. Heim, I don't know how you look at it, but here is a bank statement for $14,000; that to me is a lot of money in itself.' And he said, 'The money that is left is yours and you ought to decide what you want done with it,' and Uncle Jule said, 'You take it, Fred, and do as you like with it, it is yours.' Mr. Bauer said, 'Well, aren't there any members of the family you would like to leave it to, or anybody you would like to divide it among?' And Uncle Jule said, 'Oh, the wolves, they have had enough. Those wolves, they have had enough; it is yours, Fred, take it and do as you like with it.'" Mrs. Roggenbrodt further testified that "Mr. Bauer said, 'Well, you have other bank accounts, haven't you?' and Uncle Jule said, 'Yes, the books are in the second drawer of the washstand at the foot of the bed.' And there was a red semi-hard paper notebook he wanted us to find, and we took out the drawer and we looked for these things. We found the red notebook, but the bank book we didn't find. There were many, many papers in the drawer and we didn't find the bank books." The witness further testified that when

Mr. Bauer left she called Dr. Shapiro, the doctor who had cared for Mr. Heim, and asked him to arrange to have Mr. Heim taken to the hospital; that the doctor demurred because he had not been paid for the services already rendered, but came to the house upon being assured that the bill would be paid; that at the direction of Bauer the witness drew a check for the doctor and one for the hospital which were signed by Mr. Heim; and that the ambulance took Heim, and the doctor drove the witness, to the hospital.

On the afternoon of July 15th Bauer took the will, which meanwhile he had prepared in his office, to the hospital for execution by Heim, and he took with him, as witnesses, two younger lawyers who had served their clerkship with him and were then his partners in the practice of law. Those two men testified to the facts of the execution. They entered the room with Bauer, and they left with him. Only those three and Heim were present. Bauer asked Heim how he was being treated and whether he wanted anything. The witnesses stood by the window, talking together and looking over the neighborhood. Heim overheard and made some comment. Then Mr. Bauer said, "Now you know one of the reasons we came here, Mr. Heim, was in reference to your will, which I brought with me." Bauer asked Heim if he wanted Bauer to read it to him, and Heim said he did. The will was read. Heim commented on only one item, the division of the real estate. Heim was asked if he knew what the paper was. He said it was his will. He was asked if he wanted the men present to sign as witnesses. He said he did. The will was then signed and witnessed. Bauer asked whether he was to take it or leave it. Heim said he would like Bauer to take care of it. Bauer took the will and, with the witnesses, left.

On the morning of July 15th, the day on which—in the afternoon—the will was executed, Bauer went to the hospital and had Heim sign a check for $3,000 on the reasonable explanation that he would need money for Mr. Heim's expenses at the hospital. About the 11th day of August Bauer became apprehensive, so he says, that Heim might reach the stage when he could not sign papers so he got Heim to sign another check for $7,500. Both checks, aggregating $10,500,

were deposited in the trust fund account of Bauer's law firm—Bauer and Ranker. Yet a strange development was that the books of the firm appeared to have no record of that money and when, after the will contest had been started, the office prepared a statement for the use of John H. Jobes, the administrator *pendente lite,* showing a list of the assets that fund was not shown thereon; and the explanation given by Mr. Bauer is that the item was noted only on a confidential sheet which he kept in his desk. One wonders how the firm's books were made to compare with the trust account at the bank when there was a fund of $10,500 in that account which was recorded only on a sheet kept privately by one of the members of the firm. The appellants had trouble in locating Julius Heim's check books from which the above mentioned checks had been taken. Mr. Bauer, on the first day of his examination, insisted that he knew nothing about it. He had no recollection, so he testified, of where he had got the checks which he submitted, on separate occasions, for Mr. Heim's signature. But overnight he found the check book in his office safe, and the book, when it was produced in court, showed a stub filled in as of a blank day in August, 1942, indicating a check drawn to the order of Bauer and Ranker Trust Fund "for deposit account of Julius Heim" in the amount of $4,000 with the word "void" written across the entry. Called upon for an explanation, Bauer testified that at "about the 17th or 18th of August, the 19th of August, long there somewhere" he met the orderly at the hospital who told him that someone had been in trying to get Mr. Heim to sign checks; so Mr. Bauer, thinking it would be well to have enough money on hand and also wanting to make sure that "someone didn't get a check signed by" Heim, drew that check and went to Heim to have it signed. But when he saw Heim he did not present it. Asked why, he said that "He was not incompetent, but I was satisfied he would not understand what I would talk to him about." It seems that Mr. Bauer was forehanded indeed in the amount of funds he wished to have on hand to care for Mr. Heim during the latter's illness. According to a letter written by Mr. Bauer to Mrs. Butterfield on October 1st, 1942, the expense of main-

taining Mr. Heim at the hospital was $49 a week for "board and keep" and $21 a week for the doctor. At that rate the $10,500, already in Bauer's hands, would, without any additions, have kept Heim at the hospital for three years; and of course a proceeding for the appointment of a guardian of property would have been available if necessary. There is no suggestion as to the identity of the person who solicited Mr. Heim, if there was such a person. Doubt enters even on that point because the porter whom Bauer named as giving the information testified that to the best of his recollection he had not seen Mr. Bauer more than once and that positively he had never spoken to him and had not told him that anyone was asking Heim to sign checks. The matter has at least two aspects. It leaves the unpleasant impression that the reason for Mr. Bauer's ignorance about the check books on his first day's examination was inspired by apprehension about that stub, and it establishes a time when even Mr. Bauer was constrained to admit that Heim's understanding had failed him.

But the odd features of the fund continue. When John J. Jobes was appointed administrator *pendente lite,* Bauer was put under order not only to make the mentioned statement but forthwith to turn over all assets and papers of the estate. Certain assets and certain papers (not the Heim check book as we have seen) were transmitted. Some weeks later, on the suggestion of the attorney for the appellants, Mr. Jobes went to the Commonwealth-Merchants Trust Company to examine the bank records of Mr. Heim's account and discovered among the vouchers at the bank the two paid checks of $3,000 and $7,500, respectively, drawn to the order of and endorsed for payment by Bauer and Ranker. That was the first knowledge that Jobes had of the transaction. The next day Jobes received word from the attorney of Mr. Bauer that he had the balance remaining in the fund, $8,212.98, ready to hand over. Bauer explains the incident by saying that the affidavit regarding the assets earlier delivered had been prepared in his office at a time when he had an attack of bronchitis and the doctor had told him to stay in bed, and that when Mr. Bogosian, of his office, brought

the paper to him for signature and oath he signed it without reading and knew nothing about the omission until six weeks later when he chanced to touch on the subject in conversation with Mr. Bogosian and made the discovery, and that forthwith the administrator *pendente lite* was notified and the balance transmitted. But the timing of the restitution, if it may be called that, was unfortunate because it happened on the day after Mr. Jobes had made the discovery himself at the banking house where Mr. Heim had carried his account and also where the firm of Bauer and Ranker maintained the firm account to which the moneys had been transferred. The thought intrudes that it would have been a likely thing for the bank to have reported the investigation and its result to Mr. Bauer and that perhaps the knowledge so obtained was the occasion for the remittance. It was strange that Mr. Bauer, a lawyer and therefore thoroughly conversant with the solemnity and significance of an oath, should have signed and sworn to an affidavit without reading it or having it read to him. Altogether quite a number of unusual episodes transpired, and quite a number of explanations became necessary.

Mr. Heim was the owner of $17,393 (appraisal value) in Public Service Corporation preferred stock and seems to have been quite oblivious of it when he gave the directions for as well as when he signed the will; nevertheless Bauer, from having prepared the income tax returns, had reason to know about it. The amounts actually shown by special deposit books aggregated, at the time of execution of the will, more than $50,000 (this in addition to the $14,000 checking account, *supra*); and Bauer admits that from the same source he knew that Heim, a little earlier in the year, had special interest bearing accounts of around that sum. In fact, all of the assets seem to have been long held by the testator, and Bauer says he had assisted Heim in preparing the latter's income tax returns since 1924 or 1925. Yet, when Heim, at the best a very sick man, spoke negligibly of not having much left after the disposition of five or six thousand dollars in real estate, Bauer did not call to Heim's mind what a large sum was represented by the stock holdings or by the interest bearing bank accounts.

It is true that competency to execute a will is a presumption of law and that the right of testamentary disposition may be exercised by one of only moderate mentality. Nevertheless a degree of mentality is required. The test of testamentary capacity in this state has been said to be that the testator can comprehend the property he is about to dispose of, the objects of his bounty, the meaning of the business in which he is engaged, the relation of each of these factors to the others and the manner of distribution set forth in the will. *Bannister* v. *Jackson, 45 N. J. Eq. 702; affirmed, 46 N. J. Eq. 593; Waddington* v. *Buzby, 45 N. J. Eq. 173; Westcott* v. *Sheppard, 51 N. J. Eq. 315; McCoon* v. *Allen, 45 N. J. Eq. 708; Ward* v. *Harrison, 97 N. J. Eq. 309.* We are doubtful whether the testator was, at the time when he is said to have given the instructions for the drawing of the will, capable of recollecting, and we are convinced that he did not recollect, the property that awaited his disposal. There is nothing that suggests to our minds that he was aware of the existence of the great bulk of his property, consisting of corporate stock and special interest bearing bank accounts.

When, at the giving of the directions, the testator said that he had very little left, the suggestion of another bank book was made to him and he said, "Yes," and that "the books are in the second drawer of the washtand;" but the further testimony of Mrs. Roggenbrodt leads us to the belief that the expression by the testator did not register with him as a concrete idea or as a recognition of the financial significance of the bank books. He looked with, apparently, unseeing eyes and unappreciating mind as the searchers, a few feet away, fruitlessly went through the drawer. The witness Roggenbrodt says that she told him they could not find the books and that, so far as she remembers, he said nothing; the witness Bauer testifies that when the books were not found "nothing was said to him [Heim] about it." In either event, the disappearance of, or the failure to produce, the indicia of fifty thousand dollars of money meant nothing to the testator. From any angle the incident is not consistent with capacity on the part of the testator to recollect the nature or the extent of his property. The occurrence assumes the greater

importance because we are not satisfied that the testator had a thorough understanding of the fact that he was arranging a last will and testament. The incident which, according to the testimony of Mrs. Roggenbrodt, started the whole chain of circumstances was that, on the preceding night, she heard Mr. Heim say "that he wanted to settle up his affairs," whereupon the witness forthwith suggested that she call Mr. Bauer; and so the word was passed on to Mr. Bauer that "Uncle Jule wanted to settle up his affairs." When Bauer came the latter said, "You have sent for me to come and take care of your affairs;" to which Mr. Heim said, "Yes." Then Bauer suggested drawing a will, and "Uncle Jule said 'Yes.'" Then the directions are said to have been given; but Mrs. Roggenbrodt did not hear Heim say who was to be the executor and, so far as appears, heard nothing about an executor. Bauer's words to Mr. Heim indicate that Bauer did not understand Heim to have meant, by the summons to look after his affairs, that he wanted to arrange for a will. That business was suggested by Bauer. Bauer's letter of August 11th to Mrs. Butterfield said: "We had a real job convincing him to leave the old house and go to the hospital and I finally had to make believe that I would not see him again unless he did go and then he gave in." Clearly, here was an admission that pressure was brought to bear upon Heim by Bauer although the pressure is said to have been to get Heim to go to the hospital. Was Heim's plan, in so far as he had a plan, anything more than the final surrender of a senile mind to the pressure of persons and events, the giving up of the fight, the submitting of his body to hospitalization and of his affairs to a lawyer and thus acquiring rest and peace? Bauer quotes Heim as later saying to Mrs. Schultz in the hospital, "I put everything in Fred Bauer's hands and he has all my worries." The circumstances under which that was said and the words themselves convince us that that reference, for whatever it may be worth, was not to a will but to the placing of his business affairs in the hands of his lawyer; and that seems to have been the thought with which Heim began.

It was a circumstance strange to the point of being suspicious that Bauer, with Mrs. Roggenbrodt's help, searched

through the washstand drawer (having first removed the drawer for that purpose) and failed to find the books, although three months later, after Heim's death, the house having been unattended in the meantime, a woman clerk from Mr. Bauer's office—so she testified—went to the house and found the bank books in that very drawer. If the books were there on the afternoon of July 14th why were they not found? It was Bauer's duty to make careful search in justice to and for the information of his ailing client. And if they were not there, where were they? And who placed them back? And when? Other assertions by Bauer would be clearly untrue if it appeared that from that night forward he had the knowledge that those books would have given concerning the volume of the estate; and perhaps the explanation lies therein. For instance, Mr. Bauer in a letter to Mr. Charles Heim (in California) on August 11th, 1942, said: "I am keeping him at the hospital for another ten days for further observation but after that I rather think I will have to move him to some place where I can get by more reasonably to make sure that what little funds he has left will be sufficient to keep him without charity;" and in a further letter to the same Charles Heim written on August 18th, 1942, Bauer disavowed knowledge of any considerable estate: "* * * I have noted what you say with reference to the affairs of your brother. I am not in a position to speak intelligently about anything, except his bank account, in which there is, perhaps, enough money to see him through one or two years at the present rate of expenditures." That was not the truth if Bauer knew of the bank books or of the wealth that they represented. Bauer gives as the explanation, "We just went through in a cursory sort of way and didn't find them. Nothing was said to him [Heim] about it. It was a very warm day and I was really glad to get along and go about some other work I had to do." That is a peculiarly unsatisfying statement in view of his testimony elsewhere that the reason for looking for the books was "I suggested to Mrs. Roggenbrodt perhaps if he is going to the hospital we had better have those bank books out of the house" and also in view of the importance to Bauer of knowing to what extent the death of this ill and

aged man would increase his own financial worth, for Bauer had lately filed data with his bank showing that his liabilities exceeded his assets. It is a fair inference from the proofs that Bauer was reasonably certain of the *quantum* and the details of Mr. Heim's estate. With that knowledge and with the lively expectation that he would soon profit so generously from the will it was his duty to bring the facts clearly to the fading mentality of the testator. For a lawyer to abuse the obligation of responsibility to a client he has been called upon to serve, by permitting that client, physically and mentally ill, to stumble blindly along a mistaken road, to the lawyer's pecuniary advantage, is to make undue use of the influence which the trust relationship has brought to him.

Mrs. Roggenbrodt's testimony, *supra,* discloses that the subject of a will was not suggested by Mr. Heim and that the first mention of that word came from Bauer. There can be no criticism of a suggestion from a lawyer to a very sick client that the latter should make a will; but the incident is worthy of note and seems clearly to indicate that the impulse which moved Heim to send for Bauer was not to make a will of any sort and, therefore, not to make a will leaving his estate to Bauer.

It is inevitable that under the circumstances and on such an issue Bauer's story should be scrutinized for truths and untruths. In a letter of November 12th, 1942, to Mrs. Butterfield, Mr. Bauer said: "While I do not know any specific interest (*sic*) when your brother named you particularly, he felt kindly disposed toward you and even in his last days when I said I received a letter from you his face would light up in smiles indicating that he thought well of you." Yet this sister was one of the two referred to by Bauer in his testimony about the giving of instructions for the will as follows: "And I said, ·'Now, just a minute, Mr. Heim, you have a brother, you have two sisters, of which I know. Don't you want to do something for them?' He said, 'The hell with them, they are a pack of wolves that got all they are going to get.' " Which of those inconsistent statements is true? Or are they both true, and was the testator's mind accordingly unstable?

Bauer testified—the subject-matter, again, was the instructions given by Heim about the will—: "I said, 'What else? What about the rest of your assets? You have taken care of the real estate.' Then he gave me the greatest shock I have ever had in my life. He said, 'You take that and do what the hell you want with it.' Those were his exact words." It is not clear, on the hypothesis of Bauer's story, wherein lay the reason for such a shock, unless Bauer knew there was materially more than the $14,000 shown by the checking account statement. Bauer knew, so he says, that Heim had taken a violent dislike against members of his family and so far back as 1938 or 1939 Heim had said, "I want to take care of you," whereupon Bauer replied, "That is very nice of you, and I would never refuse taking anything anybody wants to give me. But you cannot do those things unless you provide for it in the will." Heim said, "Nobody can stop me from leaving a check for you for five or ten thousand dollars, can they?" and Bauer replied, "No, but that is not the way to do those things. If you want to do it, the better way is to make a will because that check might not amount to anything, in fact, I do not think it would be worth anything." "Well," said Heim, "I will work it out and I will let you know." Heim's imputed scheme of "taking care" of Bauer with a check for five or ten thousand dollars signed in life to be effective at death has something like an echo in the fact that the checks actually signed by Heim and delivered to Bauer at Bauer's suggestion aggregated $10,500 from which there was the net free sum at death of $8,212.98.

But there was a further statement by Bauer which requires comment. It was in a letter written to Mr. Charles Heim (brother of the testator) on November 30th, 1942, and was as follows: "I am sorry that there is any disappointment with reference to your brother's will, but I do know that the will as it stands was in his mind in this form for at least five years." Either that statement was conclusively untruthful in itself or it puts the mark of untruthfulness upon Bauer's testimony about being shocked by the discovery of Heim's wishes on July 14th, 1942.

The events of the execution itself are more notable for what they did not, than for what they did, include. Bauer had sound reason for anticipating that the testator's family would be highly indignant to the point of combativeness. To the mind of a lawyer the circumstances all pointed toward trouble. Yet Bauer left undone many things that would have made strong support for the will, if the fact was that Heim had testamentary capacity and had the purpose of doing what the will presents. Bauer could have urged upon the testator the questionable propriety of a lawyer drawing and supervising the execution of a will in his own interest and could have asked that another lawyer be called to act. He could have prefaced the execution by calling upon an outstanding physician, or more than one such, skilled in measuring mentality, to test the testator's capacity to make a will. He could have procured wholly disinterested witnesses and could have taken occasion, before them, to make fair test of whether the testator could comprehend the nature and the amount of his estate and the existence and nearness of kin rather than talking upon such trivial subjects as the weather and whether the testator wanted his pipe. He could have called upon the testator, in the presence of disinterested and unbiased witnesses, to have announced, without suggestion, that the testator's purpose, having an estate of thus and so, was to give it almost wholly to the lawyer, naming him. He could, at least, have absented himself from the bedroom while the execution was had instead of standing, pen in hand, beside the sick man's pillow. But he did none of these things. There was no doctor, no nurse, no orderly in the room, although the *locus* was a hospital where presumably, with a little planning, such an unbiased and disinterested observer could have been had. The proponent could not have taken less precaution had he been supervising at the execution of a will, in which he had no personal interest, by a testator in sound health of mind and body.

Both witnesses testified that Bauer read the will item by item and after each item asked and received Heim's approval. But they had not read the will themselves, and there is nothing to indicate that they were aware of the contents of it

except as read aloud by Bauer; therefore they could hardly have known at the time whether Bauer was reading it accurately. They identify the document as being the same, as doubtless it is—it bears their signatures; and they say they heard it read. But neither of them undertakes to say in so many words that Heim was told that the will gave Bauer the residuary estate or that there was any statement to Heim of the relative proportions that went to Bauer on the one hand and to the family on the other. The great bulk of the will, in point of items, space and words, was devoted to the disposition of small-value real estate and of the cemetery plot. Thus, the will carried the names of a number of testator's relatives—Charles Lincoln Heim, Florence Heim, Adeline Brower, John Brower, William Roggenbrodt, Anna Roggenbrodt, William Henry Roggenbrodt, Jeanette Heim and Charles Heim— quite an imposing list of family beneficiaries and possibly suggestive to the testator that he was doing well by his kin, particularly if his mind was blurred to the actual or relative extent of the gifts.

When Mr. Bauer took the will to the surrogate's office for probate, he requested that the information regarding the will be kept out of the newspapers; and no publicity was given to the will at the time.

Both of the witnesses to the will were waited upon at the office of Mr. Bauer's law firm by Mr. Keane and Mr. Johnson of the attorneys for the contestants and were asked, in advance of trial, to relate the circumstances concerning the execution of the will. They refused to say anything, an attitude that was within their rights but which, considering their connection with the proponent of the will, puts upon them the stamp of bias. Further, it did not clarify the atmosphere of Mr. Bauer's case to have the incidents of the execution kept by his associates as a closely guarded secret.

Testimony from other sources is persuasive that from the very entrance to the hospital Heim did not have a comprehending mind and had delusions which at times were nauseating in their manifestations. William Beckler was a porter at the hospital. He remembered the day Heim entered the hospital and went to see him every day. According to that

witness the patient was not merely incontinent and unable to control his bowels—those conditions came from an impaired body. He would throw the bowel movement around the room; and that was a manifestation of an impaired mind. Every morning the patient would insist that coal be brought in and put by the stove in the room, although it was the summer season and there was no stove there. The witness, although he never brought any coal, would tell the patient that he had, whereupon the patient would say, "All right, get out of here." The witness declared that Heim was in that condition from the very day of entering the hospital.

Dr. Kaplan is a practicing physician of the State of New Jersey. He was in the North Hudson Hospital during the period in question completing an interneship for his admission here. Although he testified that he had been on the staff of the Coney Island Hospital for twelve years as associate attending physician and had previous to that served an interneship at that hospital. He testified that he saw Heim at the very beginning, at most only a few hours after his admission; that Heim was incoherent when he first saw him; that he was sure that Heim did not know what the witness said to him; that there was no relation between the answers given by Heim and the questions asked and that it was the doctor's considered opinion that Heim at the time he was in the hospital had no ability to comprehend anything and that he did not think the man had the mental ability to comprehend the nature and extent of his property, or the nature and extent of his relatives and friends, or the nature of a will. Dr. James L. Evans, administrator at the hospital, described Heim as "a childish old man."

The case history, as produced from the hospital files, contains this summary (prepared the first or second day after death) :

"Summary

Pt admitted to hospital after a slight fall in which he sprained his ankle.

Pt was an emaciated old man, incoherent and incontinent.

Although not suffering from any specific disease it was plainly manifest that this man was in the last stages of senility.

Pt continued more or less unchanged, which meant poor, for 104 days. On the 104th day he developed an elevated temperature with cough & signs of broncho pneumonia. He became worse till the 108th day, 4th day of elevated temp, when he expired.

Kaplan."

The "bedside notes," a contemporaneously kept record also from the hospital files, showed this entry for July 14th (the night following the instructions for, and preceding the day of, the execution of the will) : "Talking incoherently at times."

The nephew, Charles Lincoln Heim, already mentioned as well known to the testator and on friendly terms with him, called at the hospital three days after the will was executed. In the presence of William Roggenbrodt, Charles spoke to his uncle but got no answer. He tried to talk with him but conversation was impossible. The same experience was repeated by Charles Lincoln Heim on the following Wednesday and on subsequent occasions. Twice Julius Heim spoke but with words that lacked sense.

Mrs. Irma Schultz, a niece, of whom Julius Heim had been fond, for whom he had done much, and between whom and him there had been cordial relations until very shortly before he was taken to the hospital, called at the hospital and saw him on July 15th—the day the will was signed and on subsequent days. She did not discuss business matters with him "because the man was too sick and he could not understand anything. * * * You could not make the man understand."

Significant omissions from those who were called to the witness stand were Millie Balgaretti and Dr. Shapiro. Miss Balgaretti moves like a silent shadow through the pages of the transcript. Bauer knew her parents, knew them before this case came up; knew Millie, understood she had been in the habit of bringing meals to Mr. Heim; saw her at the Heim house about six weeks before the will was drawn when he went there in response to a telephone request which came from some one, whom Bauer does not remember; she was coming in with some food just as he got there. It was Millie Balgaretti who was with Heim when Officer Cereghino came there

in response to a call; so, too, when Officer Shatajian on another day answered a summons. It was she who telephoned Mrs. Anna Roggenbrodt, as an outcome of which Bauer was called in the manner already described. If Heim was not in the condition, during these important days, which was testified to by Charles Lincoln Heim and the police officers, it would seem to have been a simple matter to have put Millie Balgaretti upon the stand in contradiction; particularly since she was in court at the time and identified by Bauer on his direct examination as "this young lady here." Dr. Shapiro was Mr. Heim's personal physician; he visited Heim on the afternoon of July 14th, immediately after the giving of the directions for the will, and went to the hospital with him—driving in his own car while Heim was taken in an ambulance; he was in regular attendance upon Heim at the hospital. On Bauer's instruction, Mrs. Roggenbrodt drew and had Heim sign a check to Dr. Shapiro's order on July 14th for $25; and Bauer himself checked (from the trust fund) to Dr. Shapiro as follows: July 27th, $70; August 11th, $45; September 8th, $82; September 29th, $66; October 19th, $60; October 30th, $75. It would seem that under all of the circumstances, Dr. Shapiro was peculiarly an appropriate witness for Mr. Bauer to produce, and a very valuable witness for the proponent of the will; provided, of course, he could have contradicted the testimony of the witnesses recently mentioned, as well as of Dr. Kaplan, Dr. Evans, Beckler and others, and had also been able to dispute the accuracy of the hospital records.

Aside from the proof of formal execution of the prepared document, respondent relies chiefly upon his own testimony and that of Mrs. Roggenbrodt to prove that he had not exercised undue influence upon Mr. Heim and to disprove the appellants' proofs contra as well as their proofs of lack of capacity. We have not extensively reviewed Mr. Bauer's own testimony. Enough to say that we have studied it carefully. It presents inherent contradictions, most but not all of which we have mentioned, and it presents improbabilities to the extent that its credibility in important respects is impaired. Mrs. Roggenbrodt is interested in the outcome at least to

the extent of a devise to her son, including her trusteeship in his behalf, which fail if the will is set aside, and perhaps also because of an incident about to be mentioned. Effort was made by appellants to cross-examine Mrs. Roggenbrodt about an alleged promise made by Mr. Bauer to "take care" of her husband out of the estate funds after the matter should be "all over." Mrs. Roggenbrodt said that she was not present when the matter was discussed but she admitted that her husband had told her about it. Objection was made to further testimony from her as hearsay. But Bauer later testified that about a week after the funeral he said to Roggenbrodt that he "appreciated very much the co-operation he and his wife had given us throughout the whole thing in connection with the handling of the hospital charges and the funeral, giving me the information I needed in order that everything might move along smoothly, and that when everything—when all the administration affairs had been taken care of, I would do something for him." The implications possible to be drawn from that loose promise to pay an unfixed sum contingently upon the time arriving when "all the administration affairs had been taken care of," relayed by the promise to his wife, may easily have biased the wife's testimony. Roggenbrodt himself did not take the stand.

We are of the opinion that the testator was, as the hospital doctor said, senile; that his mind was tottering and completely unstable; and that he was ripe for manipulation. We have grave doubt whether he was, at the time of executing the will, capable of recollecting the property he was about to dispose of or the objects of his bounty or of understanding the manner of distributing the property or indeed the nature of the business in which he was engaged. We are clear that the testimony produced to countervail the presumption of undue influence was neither impeccable nor convincing. The proponent of the will did not successfully carry his burden. The decree in the Prerogative Court will, therefore, be set aside to the extent that it grants probate of the will. The allowances therein contained seem not to be the subject of appeal.

The decree will be reversed to the extent aforesaid and the

record remitted to the Prerogative Court there to be dealt with in accordance with this opinion.

*For affirmance*—None.

*For reversal*—THE CHIEF-JUSTICE, CASE, BODINE, DONGES, PERSKIE, PORTER, COLIE, WELLS, RAFFERTY, HAGUE, THOMPSON, DILL, JJ.   12.