This is an appeal by Patrick Hughes and Peter Hughes from an order admitting to probate a will of Peter Flynn dated October 8, 1947, under which Margie Gitler was the principal beneficiary. The advisory master, to whom the Essex County Orphans' Court had referred the matter for trial, found that: "The circumstances related, taken with the fact that on October 8th Peter Flynn was much dependent upon her for his care, give rise to a presumption of undue influence," but concluded that "the facts being all laid out here, the presumption is to my mind rebutted; the suspicion that the testator's free agency was *Page 148 
destroyed, is sufficiently laid to rest by the incident as to the strong box." We concur as to the presumption of undue influence exerted by the beneficiary, but we are not in accord with the conclusion that such presumption was overcome.
The decedent was in his late seventies at the time of his death on November 19, 1947. He was a childless widower; his wife had died in 1946. The appellants were nephews of Mrs. Flynn and distant relatives of the decedent. From the time they came over from Ireland in the 1920s, they had made their home with the Flynns until 1939 and 1940 when they married. Their relationship with the decedent was friendly, intimate and helpful, based on "frequent visits, shopping, household chores, repairs and other matters undertaken on his behalf." The advisory master said: "Of all the persons in the world, they were apparently the closest to him from the time of his wife's death until August 16, 1947." The will referred to was the fourth decedent had made since the death of his wife. Under the three earlier wills, the estate was left to the caveators and nothing was left to Mrs. Gitler. We have searched the record in vain to find any credible evidence, aside from the "strong box" incident, to which we shall later allude, to indicate any conduct, or acts of commission or omission on the part of the caveators in relation to the decedent which would have actuated or motivated him to completely cut them off as his beneficiaries and substitute Mrs. Gitler in their place.
Mrs. Gitler was testator's niece and from the age of about four to eighteen, she was cared for by Mr. and Mrs. Flynn, as foster parents. Apparently, her feeling for them was far from filial, and a source of disappointment to them. At the age of 18, she left their home and did not enter it again until some fourteen years later upon the occasion of Mrs. Flynn's funeral. The next time she saw Mr. Flynn was about a year later, in July or August, 1947, when she and her family were about to be dispossessed from their living quarters. She then came to plead with Flynn to take her into his home and he, not without some misgiving, allowed them to move in on August 16, 1947. Until that time, Flynn had not met her *Page 149 
husband, and seemingly was not convinced of her marriage until she exhibited her marriage certificate.
Flynn was confined in hospitals six times in the space of about a year and four months, from the death of his wife in July, 1946, to the date of his death on November 19, 1947. The hospital records show that he was suffering from advanced arteriosclerosis, heart disease, hematuria and partial paralysis, and that he was at times disoriented and irrational.
Within thirteen days after the Gitlers moved in, Flynn was hospitalized for six days. After he had been home about two weeks, he was acutely stricken and again removed to the hospital. Following a stroke his condition was so serious that on September 25, 1947, the last rites of the church were administered to him. Four days later, on September 29th, after having suffered a cerebral thrombosis and while in extremis, he made a codicil to his will, which, to say the least, is singular in its execution and content. It was written in long hand by the attorney who had represented Mrs. Gitler in the dispossess proceedings. It was signed by Mr. Flynn by his mark, which was very quavery, and, since he could write, gives further evidence of his poor physical condition. The recital in the codicil expressly states that he had no definite recollection of the date of his last will. The codicil bequeaths the sum of $1,000 to his niece, Mrs. Gitler, "which is to be paid to her first, before anyone else receives anything from my estate, and the said $1,000 is to be a lien on my real estate until paid."
During the argument of this cause it was stated by counsel that the estate approximates $25,000. Accordingly, it was certainly not necessary to impress a lien for so small a bequest, and the inclusion of such a provision gives rise to the inference that the testator's condition was such that at the time he did not know the size of his estate, or that Mrs. Gitler and her attorney not knowing it, thought it wise to secure her bequest.
Mr. Flynn was released from the hospital on October 6th at Mrs. Gitler's insistence and against the doctor's advice. Two days later, he executed the will which was offered for *Page 150 
probate, under which his entire estate, with the exception of a $500 bequest to his church, is bequeathed to Mrs. Gitler. His condition at that time, in spite of his removal from the hospital, must have been critical in view of the deteriorating effect of his many ailments, as evidenced by his repeated and increasingly frequent hospitalizations. The testimony of two impartial witnesses, Mr. and Mrs. Walcott, who were decedent's first floor tenants, corroborates that on the date the will was executed, the testator was helpless and did not recognize them.
For some weeks after the Gitlers moved in to Mr. Flynn's home, the close relationship between the decedent and Patrick and Peter Hughes continued. As late as September 21st, Patrick Hughes drove the decedent to the hospital, but the proofs strongly indicate that after the execution of the codicil and Mr. Flynn's return to his home, Mrs. Gitler discouraged visits from the Hughes brothers. She did not notify them of Mr. Flynn's final hospitalization, or of his death, nor let them have any voice in the funeral arrangements.
The Court of Errors and Appeals declared In re Neuman'sEstate, 133 N.J. Eq. 532 (E. A. 1943), "No exclusive formulary may be prescribed that will serve as a standard or norm to ascertain the presence or absence of what the law denominates undue influence in any given case. But each case must be decided according to the attending facts and circumstances. In one instance, if a testator was enfeebled by age and disease slender proof of influence exerted by one holding a relationship of trust and confidence could justify the conclusion that it was undue, while in another instance, like evidence would be wholly inadequate if the testator was a vigorous and strong-willed person." As above stated, the testimony established a satisfactory case from which a presumption of undue influence on the part of the principal beneficiary arose. We believe, however, that the master, in concluding the presumption rebutted, placed entirely too much emphasis on the incident of the strong box, even though it be assumed true. The strong box evidently contained the savings account books of the decedent and some $700 in *Page 151 
cash, and had been entrusted by the decedent to Patrick Hughes on several, if not all, of the occasions when he was taken to the hospital. The inference is that on the last occasion the decedent asked for the strong box and that it was withheld without reason, and that because of this incident the testator decided to favor Mrs. Gitler as against his former beneficiaries. The caveators deny this incident and the inference imputed, but even if Patrick Hughes did withhold the box, assuming that that might have been a reason for a grievance against him personally, it would certainly not be sufficient reason to disinherit both brothers.
It is significant that Robert Gitler, the husband of Marjorie Gitler, was not called as a witness by his wife. The failure to call this witness is indeed singular in the face of a charge against his wife of undue influence, particularly since he had been living with his wife in decedent's home during the period in which undue influence was alleged to have been exerted.
In view of all the circumstances shown by the proofs, we do not believe that the presumption of undue influence inherent in the instant facts has been convincingly overcome. In re Heim,136 N.J. Eq. 138 (E. A. 1944).
The judgment below is reversed.