Waddington v. Buzby.

GEORGE G. WADDINGTON, appellant,

*v.*

NATHAN W. BUZBY, respondent.

1. A person who is aged, infirm and almost blind, may make a valid will,. if capable of recollecting the property she is about to dispose of, understanding the manner of distributing it as therein set forth, knowing the objects of her bounty, and the nature of the business in which she is engaged.

2. The facts that the draughtsman of the will is executor, and his wife and son are favored legatees, while they call for suspicious scrutiny, will not invalidate the will, without some more certain evidence appearing of fraud, or undue influence.

3. Each case must be judged by its own circumstances, and no general rule can be made applicable to all cases.

On appeal from the decree of the ordinary, affirming the order of the orphans court of Salem county, refusing to admit to probate a paper propounded as the last will and testament of Ruth W. Buzby, deceased, reported in *16 Stew. Eq. 154.*

*Mr. W. T. Hilliard,* and *Mr. W. E. Potter,* for the appellant..

*Mr. C. H. Sinnickson,* for the respondent.

The opinion of the court was delivered by

SCUDDER, J.

A careful consideration of the facts in this case has changed my first impression, and led me to a different result from that reached in the courts which have made the prior examinations. of the questions presented. It appears, in my judgment, that sufficient weight has not been given to the extent of the right which the law gives to the owners of property to dispose of it by will; the moderate capacity required for the exercise of this right, and the aid they may invoke from others in giving order

and legal form to their wishes, without subjecting them to the charge of fraud and undue influence.

At the date of this writing, and its execution, April 20th, 1882, Ruth W. Buzby was about eighty-three years old, and she died in 1886. She was feeble and forgetful to the extent that persons ordinarily are at such an advanced age, and she was nearly blind, so that she could not read, or did so with difficulty. But she could at that time go about the house, knew the members of the family, talked about her business affairs, remembered the amount of her property and where it was invested, objected to the reduction of the percentage of interest, took a part in the routine of the house and the payment of bills, and conversed with visitors whom she knew. She had been an intelligent woman, but not of very strong will, rather reticent than talkative, and became more silent and absent-minded as she grew old. She was injured by a fall, and failed in physical and mental strength from that time gradually until her death. The opinions of witnesses as to her mental capacity are of no weight, unless sustained by facts on which such opinions are founded; and those who saw her seldom, or but once, and say she was silent and appeared absent-minded, gave little aid in determining this question. *Lowe* v. *Williamson, 1 Gr. Ch. 82; Sloan* v. *Maxwell, 2 Gr. Ch. 563; Whitenack* v. *Stryker, 1 Gr. Ch. 8; Andress* v. *Weller, 2 Gr. Ch. 604; Stackhouse* v. *Horton, 2 McCart. 202; Pancoast* v. *Graham, 2 McCart. 294; Stevens* v. *Van Cleve, 4 Wash. C. C. 262; Den* v. *Vancleve, 2 South. 589; Harrison* v. *Rowan, 3 Wash. C. C. 580; Turner* v. *Cheesman, 2 McCart. 243; Eddy's Case, 5 Stew. Eq. 701, 6 Stew. Eq. 574; Collins* v. *Osborn, 7 Stew. Eq. 511,* and others that might be cited, are cases in our State, where persons who were aged, diseased, blind and infirm have executed wills, and the rule of capacity by which they may be sustained has been enunciated. It is shown, to my satisfaction, that the testatrix, at the time she executed this writing, was capable of recollecting the property she was about to dispose of, understanding the manner of distributing it therein set forth, the objects of her bounty and the nature of the business in which she was engaged. If so, she had the requisite tes-

tamentary capacity.   The paper was, in fact, executed by her, as her last will and testament, in the presence of two witnesses, present at her house at the same time.   The attesting clause does not say that they signed in the presence of the testatrix.   One of these subscribing witnesses is dead ; the other is living, but does not remember the circumstances; he is certain as to his signature, and that of the other witness is proved by his son.   It is shown by the testimony of the other two persons who were present at the signing of the paper, that they were all together in the dining-room when she signed, and requested them to sign as witnesses to her will.   This completes the attestation.   It also appears that the will was read to her before signing.   She took the will, after execution, herself, upstairs, put it in a box with her other papers, in a drawer of her room where she slept, and it remained in her possession until her death, about five years after its date. Of the fact of its due execution, and her capacity to make it, there seems to me to be satisfactory proof offered.

The more serious question in the case is, whether Ruth W. Buzby executed this writing, purporting to be her last will and testament, through the undue influence of George G. Waddington, the proponent.   The influence that will vitiate a will must be such as, in some degree, destroys the free agency of the testator and constrains him to do what is against his will, but what he is unable to refuse, or too weak to resist.   *1 Jarm. Wills* § *37; Lynch* v. *Clements, 9 C. E. Gr. 431; Moore* v. *Blauvelt, 2 McCart. 367.*

It is claimed that this appears in several particulars.   The proponent wrote the will, in which he was made sole executor and his son and wife were favored legatees.   In *Rusling* v. *Rusling, 8 Stew. Eq. 120, 9 Stew. Eq. 603,* it was said that the fact that the will was drawn by a favored legatee, while it calls for suspicious scrutiny of the circumstances, does not of itself invalidate the will.   The same rule would apply where the legacies were given, not to himself, but to those who stand in such near relationship to him as a son and wife.   We must, therefore, look for other circumstances.   Each case must be judged by its own

circumstances, and no general rule can be made applicable to all cases.

The testatrix had three children—Mary Buzby, Beulah Gaskill and Nathan Buzby. The son had died some years before her death, leaving a son of the same name, who is the caveator against the probate of this will. Mary Buzby lived with her mother until she died, on March 29th, 1882. She cared for her in their home, aided her in the management of her property, but there is no evidence that she exercised undue influence over her. Her entire property was the sum of $5,200, invested in bonds and mortgages, and some household furniture of no great value. Some years before her death she made a will, by which she bequeathed $1,200 to Beulah Gaskill, and the residue to Mary Buzby. That will was drawn by Aaron Fogg, a neighbor. On the evening before Mary died, a codicil was written by Aaron Fogg to this will. He went to the testatrix's house, at the request of the proponent, and it was there executed by Ruth W. Buzby, and witnessed by him and his daughter, who went with him for that purpose. The exact form of the codicil is not given, but it was for the benefit of Mary B. Waddington, the proponent's wife, who is the daughter of Beulah Gaskill, and granddaughter of Ruth W. Buzby. She was taken by the testatrix when an infant, named after her daughter Mary, brought up by them with care and affection, and remained with them until her marriage. By the will in controversy, $1,500 is given to Beulah Gaskill, and some furniture; $100 to Ann B. Gaskill, and some silverware; $100 to Isabella P. Gaskill, and some silverware; $600 to Asher B. Waddington, her great-grandson; $600 to Martha Hancock, in lieu of any charge for services, or otherwise, she might make against her estate, and the residue to Mary B. Waddington, her granddaughter.

Her reason for giving no legacy to her grandson, Nathan W. Buzby, the caveator, is stated in her will in these words:

"My grandson, Nathan W. Buzby, heired a legacy for one thousand dollars by the will of his grandfather, Asher Buzby. By the failure of my co-executor, George W. Ward, I have been compelled to pay the greater part of said

Waddington v. Buzby.

legacy out of my own resources, and this is the reason my said grandson, Nathan W. Buzby, is not mentioned as a legatee in this instrument."

This payment was demanded of her by her grandson when it was said that she had but $10 left in the house for their present support, and there is evidence that although she was patient at the time, and afterwards treated him with kindness and affection, she was displeased with his demand for the money, and his extravagance in spending it after he had received it.

Beulah Gaskill went to live with her mother after Mary's death and remained with her until her death, with the promise that she would be provided for. She also received $1,500 by the will of her sister Mary. From this disposition of the property it will appear that all, excepting $600 given to Martha Hancock for services in the family, from the time she was a child, was bequeathed to Beulah Gaskill and her children; Mary B. Waddington and her son Asher, namesake of his grandfather, receiving the greater portion of the estate. The exclusion of Nathan W. Buzby was in the former will drawn by Aaron Fogg, with which Waddington had no connection, and Beulah Gaskill's individual portion was largely increased after the death of her sister Mary by her will and by the terms of this will, though in these proceedings she is hostile to the proponent.

These dispositions appear more like the natural operation of the mind and affection of the testatrix than results of the fraudulent contrivance or undue influence of Waddington, who wrote this will. His conduct, his character and relationship to her do not warrant such charges against him without more direct and certain evidence. Until about the time of Mary's death it does not appear that he took any interest in her business. He lived at Elsinboro, two and a half miles from the testatrix's home in Salem. After Mary's death he attended to her money matters, collected her interest and deposited it for her, advised the investment of her money, when the security was changed, and, with her consent, re-invested it for the best rate of interest she could obtain. He was the husband of her granddaughter, and, apparently, the nearest connection with whom she could advise, and on whose judgment she could rely as the infirmities of age in-

creased. While it would have been more delicate and prudent for him, under the circumstances, to secure the services of a stranger to prepare a will for the testatrix, yet, if she had sufficient capacity to make it, and this is the voluntary expression of her wishes in disposing of her property, his mistake, or even officiousness, in tendering his services, should not be allowed to defeat her purpose, long entertained and expressed in a former will, to exclude the caveator from any portion in her property. The decree should be reversed, and the will admitted to probate.

Under the peculiar circumstances of this case the caveator will be allowed $250, in lieu of costs, expenses and allowances in all courts, and the executor will be given his costs and expenses out of the estate.

*Decree reversed.*

*For affirmance*—KNAPP, PATERSON—2.

*For reversal*—THE CHIEF-JUSTICE, DEPUE, DIXON, GARRISON, SCUDDER, VAN SYCKEL, BROWN, CLEMENT, COLE, McGREGOR—10.