10 N.J. Super. 276 (1950)
77 A.2d 46
MARGARET McGOWAN, PETITIONER-APPELLANT,
v.
PETER DOELGER BREWING CO., RESPONDENT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued October 30, 1950.
Decided December 6, 1950.
*278 Before Judges JACOBS, EASTWOOD and BIGELOW.
Mr. Perry E. Belfatto argued the cause for the appellant.
Mr. Andrew Lawrie argued the cause for the respondent.
The opinion of the court was delivered by BIGELOW, J.A.D.
Appellant, who is the widow of John McGowan, made claim in the Workmen's Compensation Bureau that her husband's death August 22, 1946, resulted from an accident July 7, 1946, which arose out of and in the course of his employment. The Bureau made an award in favor of the petitioner but the County Court, upon rehearing the matter, gave judgment for the employer, the Peter Doelger Brewing Co., on the ground that death was not caused or hastened by what occurred on July 7th. There seem to be two questions in the case  Just what did happen on July 7th? And did that occurrence hasten McGowan's death that came to pass six weeks later?
Decedent worked as a fireman's helper, shovelling coal and taking out the ashes  heavy work. Although he had had heart trouble for several years, he was able to perform his work satisfactorily and without interruption by illness, until July 7th. That morning decedent went to the engine room to help "throw an engine in." Ten minutes or so later he came out, staggering. In response to a fellow worker's query, "What's the matter, Mac?" he exclaimed, "The ammonia got me." He sat down by a table 30 or 40 feet from the engine room door, and leaned his head on the table. A police car happened to be in front of the brewery and in it he was taken to St. Michael's Hospital. We should explain that in the engine room were several refrigeration machines in which was used hydrous ammonia. The machines had not been *279 maintained in good condition. In the engine room in hot weather, the odor of ammonia was constant. "At times you couldn't go in there, the smell would be so strong of ammonia."
On July 10th, McGowan called on his physician. Dr. McGuire learned from his patient that after being at St. Michael's a few hours, he insisted on being brought home, but that he had not yet been back to work. The doctor had examined decedent the preceding January and again in June. On each of the examinations he made a diagnosis of "auricular fibrillation (irregular heart action); cause, probably rheumatic heart disease." But on the third examination, the doctor found also symptoms of "early cardiac decompensation (heart failure)," and considered that the worsening of McGowan's condition was due to exposure to ammonia fumes three days earlier. Of course, he had no knowledge of that incident beyond what his patient told him. And his examination of decedent's nose and throat revealed nothing that the doctor attributed to the ammonia.
Decedent, against his doctor's advice, returned to work July 11th. Then he had two weeks' vacation; then to work again, and on August 22nd, while at work at the brewery, suddenly he collapsed and died. It seems to be agreed by all the medical witnesses that death was caused by heart failure. In the interval between the accident of July 7th, and his death, "he couldn't do his work like he used to." "Always getting tired." "He didn't seem to be the same fellow."
It is plain that something out of the ordinary happened to decedent on July 7th and that his heart thereafter was in much worse condition than before. One of respondent's experts thought decedent may have been "a little bit overcome by the heat" that day and have had "a little bit more congestive heart failure." Another one believes that what decedent had was an "episode related to his mitral stenosis" (heart disease). "He may have developed an abnormal rhythm and had this sense of oppression in the chest." Evidence that ammonia played a not unimportant part that day is found in the fact that ammonia was very noticeable in the engine room *280 in hot weather  and the day in question was a hot one; and in decedent's own statement, "The ammonia got me." That statement was admissible as part of the res gestae. It appears to have been an immediate emanation of whatever had just happened; it was uttered naturally and not produced by calculated policy. Hunter v. State, 40 N.J.L. 495, 539 (E. & A. 1878); Andricsak v. National Fireproofing Corp., 3 N.J. 466 (1950). The respondent argues that several jurisdictions refuse to admit as part of the res gestae, the answer to a question. But the rule is otherwise in New Jersey if the answer seems spontaneous. Slayback-Van Order Co. v. Eiben, 115 N.J.L. 17 (Sup. Ct. 1935). Not only was decedent's declaration admissible, but it was persuasive evidence that the ammonia fumes were the cause of his sudden discomfort, or at least an important contributing factor. We also accept as proven that decedent did not inhale the gas in any considerable quantity or in a strong concentration, else Dr. McGuire would have discovered some evidence of it three days later. A man's involuntary reaction to ammonia fumes would make him hold his breath and run.
Did the incident of July 7th hasten the death of decedent? Dr. McGuire, who is a general practitioner and not a heart man, considered that the ammonia fumes could have had no direct effect on the heart; but that it was reasonable to believe that the accident of July 7th had a secondary effect on the heart that hastened death. What affected the heart he described as shock, excitement, "the emotional features." Dr. Bernstein, one of appellant's experts, expressed the opinion, "The incident of July 7, 1946, in which he was overcome by ammonia fumes produced an acute bronchitis with bronchial spasm, cough and anxiety and inability to get one's breath, et cetera; that because of the ammonia fumes, that threw such a load on an already damaged heart that this man who had been compensating up to that time developed gradual decompensation." And he concluded that the incident of July 7th was the precipitating factor that caused death on August 22nd. We would note that there was no direct evidence *281 of bronchitis, bronchial spasm, or coughing. Dr. York held the view that the chemical inflammation suffered from the ammonia fumes caused an added stress and strain on the "cardiovascular system" and brought about "a rapid cardiac decompensation terminating in death." His assumption that decedent "had quite a good dose of ammonia," perhaps goes further than the evidence justifies and may weaken to some extent the force of his opinion.
The respondent's three medical experts took as one of the bases of their opinions that decedent had not been overcome by ammonia fumes. They minimized too radically what happened on July 7th. Dr. Ormsby and Dr. Yaguda believed it was a normal episode in the development of decedent's heart disease, and so of course they had no difficulty in reaching the conclusion that that incident did not cause or hasten death. Dr. DeGraff thought it likely that decedent had been a little overcome by the heat that July day and that this caused a little more congestive heart failure. Still it was his opinion that the July incident did not contribute in any way to McGowan's death. The three doctors were asked to assume that some inhalation of ammonia fumes excited decedent, and they agreed that his type of rheumatic heart trouble (defect in one of the heart valves) would not be influenced by excitement. Even assuming, said Dr. Yaguda, that the gas caused a temporary increase in pressure, it would not produce any change in the man's heart muscles.
On an appeal, every intendment is in favor of the judgment under review. To raise a doubt is not enough to lead to a reversal. Phillips v. Longport, 90 N.J.L. 212 (E. & A. 1917). In all jurisdictions this is the presumption recognized in the appellate court with respect to the judicial action of the court from which the appeal is taken. 5 C.J.S., Appeal & Error, § 1533. The presumption is especially fitting on an appeal from one of our County Courts, for those tribunals are constitutional courts entrusted with criminal and civil jurisdiction at law in the most important litigation. If, under our system, the County Court saw and heard the *282 witnesses whose testimony in transcript forms the basis of the judgment, its findings would be accorded even more weight, but as it is, we should not disturb the County Court's finding of fact unless we are well satisfied that the finding is a mistaken one. Vandenburg v. John DeKuyper & Son, 5 N.J. Super. 440 (App. Div. 1949); Galloway v. Ford Motor Co., 7 N.J. Super. 18; affirmed, 5 N.J. 396 (October 16, 1950). The matter has been considered with much care by Judge W.J. Brennan, Jr., in Donofrio v. Haag Brothers, 10 N.J. Super. 258 (App. Div. 1950). Of course, we are empowered under the Rules to make new findings of fact, and the power creates a duty, which we have performed, to consider the evidence most carefully. But in determining whether to adopt the findings of the County Court, or to make new findings, we yield due deference to the action of that court.
The County Court found that the appellant had not sustained the burden of proving that the happening of July 7th contributed to decedent's death. The evidence, and especially the expert testimony, presents a sharp question. We are not satisfied that the County Court was mistaken and therefore the judgment will be affirmed.