32 N.J. Super. 413 (1954)
108 A.2d 476
WILLIAM SHAFFER, PETITIONER-RESPONDENT,
v.
ALEXANDER BROWN, T/A GENERAL ROOFING COMPANY, RESPONDENT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued October 4, 1954.
Decided October 21, 1954.
*414 Before Judges CLAPP, JAYNE and FRANCIS.
Mr. Roger F. Lancaster argued the cause for the respondent (Messrs. Schreiber, Lancaster & Demos, attorneys; Mr. Sidney M. Schreiber, of counsel).
Mr. Isidor Kalisch argued the cause for the appellant Messrs. Reid, Kelly & Flaherty, attorneys).
The opinion of the court was delivered by FRANCIS, J.A.D.
This is a workmen's compensation case in which the sole issue is whether the relationship which existed between respondent William Shaffer and appellant Alexander Brown, trading as General Roofing Company, was that of independent contractor and contractee or employee and employer. The Division of Workmen's Compensation and the County Court reached diverse conclusions; the former held Shaffer to be an independent contractor, the latter declared that he was an employee.
*415 Although a number of subordinate factors are ordinarily considered as bearing upon an issue of this kind, the crucial criterion is that of control of the injured person. If under the agreement of the parties the person for whom the services are to be rendered retains the right to direct the manner and method and means of doing the work called for as well as the result to be accomplished, that is, not only what shall be done but how it shall be done, the relationship between them is that of employer and employee. Wilson v. Kelleher Motor Freight Lines, Inc., 12 N.J. 261 (1953); El v. Newark Star Ledger, 131 N.J.L. 373 (Sup. Ct. 1944); Burdick v. Liberty Motor Freight Lines, Inc., 128 N.J.L. 229 (Sup. Ct. 1942); American Carrier Corp. v. Avigliano, 123 N.J.L. 490 (Sup. Ct. 1939); Errickson v. Schweiers Co., 108 N.J.L. 481 (E. & A. 1932).
Brown was in the roofing, siding and general home repair business and had been so engaged for about 24 years. In June 1952 Shaffer, in answer to a "Help Wanted" advertisement which appeared in the Newark Evening News, called upon Brown, who asked what he could do. Shaffer said he could do roofing, siding or leader work and thereupon Brown hired him, saying he would pay him "so much a square," the actual figures being from $5 to $8 a square, depending on the type shingles. A square is an area 10 feet by 10 feet. The price was to include the services of two helpers Shaffer said he had; also Shaffer was to provide his own ladders, scaffolding and tools and the truck to transport them to the various jobs. Brown was to supply all the materials.
Brown's operations were carried on by what he called "crews," four or five of which were working at the time of the accident. Each crew consisted of two or three men. These men, who were all engaged in the same work as Shaffer, were put on Brown's payroll as employees and deductions were made from their earnings for social security, unemployment and income taxes if their "leader" (apparently the person who made the agreement of hire for himself and his helpers) did not carry workmen's compensation insurance. If such insurance was carried, the "leader" and his helpers *416 were excluded from the payroll. This was the only reason assigned for including or excluding the workers therefrom.
Shaffer carried no insurance, but neither he nor his helpers were put on the payroll. Brown gave as the sole reason for the failure to do so that Shaffer told him he carried workmen's compensation coverage. Shaffer denied ever discussing the matter with him. However, even though Shaffer and his helpers were not carried on the records as employees, their working arrangement was the same as that of the other crews.
Shaffer worked for about two months until August 20, 1952, when the accident happened out of which this claim arose. During this period he worked for Brown exclusively and did about 12 or 14 jobs.
Brown appeared at the scene of the work and according to Shaffer "quite a few jobs he was out there and told me how he wanted it done, or sometimes he had changes * * * and he would tell me he wanted it done so and so."
Brown was more explicit as to the control he exercised. On examination by his own counsel:
"Q. Did you do any more with Mr. Shaffer than to tell him what you wanted done?
A. I don't understand the question.
Q. Just listen to the question, and if you don't understand it, say so. Did you tell Mr. Shaffer how to do his work?
A. Yes.
Q. Or, did you tell him what you wanted done. Which?
Mr. Lancaster: I submit the witness has answered the question `yes.' He told Mr. Shaffer how to do his work.
By Mr. Kalisch:
Q. You told him what to do?
A. How the job should be done.
Q. All right, describe it now. You want him to put up some scaffolding for you?
A. For instance, now look, when I take a man out on my job, he don't know what I want and what kind of a job I want. I have to explain what has to be done on the job. I don't care who he is, a contractor, a subcontractor or anybody. Then I line out what I want, the way I want it, and that is the way it is going to be done.
Q. After you lined up what you wanted done and how you wanted it done, or completed, did you after that direct his movements and say, you have to do this, after you have already given him instructions?"
*417 After objection and some colloquy between the deputy director and counsel:
"A. Yes, naturally the job has to be completed to my satisfaction."
Shaffer's activities were not limited to roofing and siding. He did odd jobs when directed, such as painting a cellar wall in one place, putting molding on the back porch of another; he fixed leaders, painted a foundation, did repair work. For this he received additional pay.
Sometimes he was not allowed to finish one job before being sent to another. Brown would take him off one and put him on another. Occasionally he would be sent to the dealers to pick up shingles for their jobs.
In August 1952 Brown entered into a contract with one Thomas Hart to do substantial roof, gutters, and siding work on certain premises in Kearny. On this job Shaffer was to do the siding, the roofing and to help Brown's maintenance man and carpenter, an admitted employee, with the gutters.
On August 20 Shaffer and his two helpers were standing on a gutter which gave way, precipitating all of them to the ground. One helper was killed, the other one and Shaffer were injured.
In view of the nature of the case and the disparate findings in the two tribunals which have already considered the matter, we have made an independent study of the record. Cf. McGowan v. Peter Doelger Brewing Co., 10 N.J. Super. 276 (App. Div. 1950). That study has led us to the conclusion that the greater weight of the evidence supports the determination of the County Court.
It is true that some of the indicia ordinarily associated with the independent contractor or employee relationship do not appear specifically. However, the proof in its totality convinces us that Shaffer was an employee. It is apparent from all Brown said and did that he controlled Shaffer in the dominant sense of employment. He moved him from job to job at will regardless of whether the point of completion was reached; he dispatched him to pick up materials, *418 assigned odd repair jobs to him, and on the very job where the mishap occurred, he had Shaffer assisting his carpenter in repairing or replacing roof gutters. Moreover, it is plain from the testimony that all of the crews were considered employees by him unless they were covered independently by workmen's compensation insurance. (Certainly a distinction based upon absence of insurance coverage cannot be made the sole fulcrum for a decision as to Shaffer's status.) And finally Brown's own strong language as to whose discretion was dominant in determining what should be done, and when and how it should be done, serves to bring into clear focus the relation of employer and employee.
It is argued further that the deputy director erred in admitting in evidence a signed statement of Morris Eggert, who was originally sued as a partner of Brown in the General Roofing Company. The statement, in which he described himself as a partner, said that "we considered Shaffer and his men as employees in the event he didn't carry a policy."
At the time of its introduction the record contained evidence of the existence of such a partnership and the statement was offered after Eggert's signature had been identified. In that posture of the proof, obviously the paper was evidential as an admission against the interest of the partnership as well as of the interest of Eggert individually. 40 Am. Jur., Partnership, § 443, p. 439. However, the testimony shows that thereafter an explanation was made of the arrangement between Brown and Eggert. This seems to have satisfied counsel that they were not partners, for he then amended the petition for compensation by eliminating Eggert as a party. When this was done the foundation for the introduction of the statement as an admission against the partnership was destroyed, and it was no longer entitled to any probative force against Brown.
In the disposition of the claim in the Division, the statement was of no consequence because of the determination adverse to Shaffer. In the County Court, where the reversal occurred, the opinion in the course of a rather exhaustive discussion of the facts makes reference to it. If the *419 statement were the only evidence upon which compensation was allowed, there might be substance to the claim of error. However, as we have already shown, the record discloses ample evidence in support of the conclusion of the County Court apart from this admission. And our own conclusion as to the condensability of the claim was made without regard to it. Consequently, no basis for reversal is presented. R.R. 1:5-3(b).
The judgment is affirmed.