JOHN PRATICO, ALEX LUSKY, MICHAEL GALLIONE, PLAINTIFFS-RESPONDENTS, v. RAYMOND L. RHODES, COUNTY TREASURER OF THE COUNTY OF PASSAIC, DEFENDANT-APPELLANT.

Argued January 10, 1955—Decided January 31, 1955.

*Mr. Nicholas Martini* argued the cause for the appellant.

*Mr. Saul M. Mann* argued the cause for the respondents.

The opinion of the court was delivered by

VANDERBILT, C. J. The plaintiffs brought this action in the Passaic County District Court against the county prosecutor, seeking recovery of money taken from each of them during the course of a gambling raid. Subsequently the parties consented to the substitution of the present defendant, the county treasurer of Passaic County, in place of the prosecutor against whom the action was then dismissed. At the trial without a jury the testimony brought out that the essential facts were not in dispute.

The three plaintiffs were admittedly players in a dice game, which took place in the early morning hours of December 6, 1953, at 43 West Broadway in Paterson, New Jersey. State and county law enforcement officers, led by the county prosecutor, conducted a raid upon the game. The front entrance to the building was barricaded with a steel door, which the police tried unsuccessfully to break down. They finally were able to force an entry through a side door, but by that time the dice game had ceased and there was no money in view on the dice table. Of the 52 persons arrested, 48, including the three plaintiffs, were players, while four were operators of the game. According to the police the plaintiffs, along with the other players, emptied the contents of their pockets on the dice table pursuant to the order of the prosecutor. The plaintiffs, on the other hand, claim that the money was taken from them by one of the detectives. In any event, the money along with personal effects was admittedly in the plaintiffs' pockets at the time the police were finally able to gain admittance to the gambling room. All 52 persons were taken to the police headquarters where the 48 players, including the plaintiffs, were formally charged with, and subsequently pleaded guilty to, a violation of the city gambling ordinance, and as a result of the conviction each paid a fine of $200. The four operators of the game were subsequently indicted and convicted of operating a dice game contrary to the provisions of *N. J. S.* 2A:112–3. The personal effects of the players were returned to them, but the money seized in the raid was turned over to the defendant county treasurer as contraband of law, as required by *N. J. S.* 2A:152–7. It is this money which the plaintiffs seek to recover.

After a full trial the trial court entered judgment in favor of the plaintiffs, Pratico, Lusky and Gallione, in the amounts of $297.04, $205, and $265.01 respectively, these sums constituting the total amount taken from each by the police at the raid. The court found as a fact that the moneys seized from the respective plaintiffs belonged to them personally, were not being used as an integral part of the gam-

bling operation, and were not dedicated thereto, and that such moneys were not earmarked and segregated as part of the gambling operation, and that the moneys seized were not a gambling device. The court further concluded that *N. J. S.* 2*A*:152–7, which provides that under certain circumstances moneys seized shall be deemed *prima facie* to be contraband, was not applicable to this case, and even if it were applicable the plaintiffs had overcome the *prima facie* presumption by showing that the moneys belonged to them personally and had not been used in any way in connection with the gambling.

On appeal the Appellate Division of the Superior Court affirmed in a two to one decision, 32 *N. J. Super.* 178, the majority declining to upset the factual findings of the trial court, although admitting that "we might have reached a different factual conclusion." The dissenting state judge took the position that the statute, *N. J. S.* 2*A*:152–7, setting up a *prima facie* presumption was applicable to the case at bar, and that therefore the case called for an independent review of the facts which would compel a reversal of the decision of the trial court. The appeal is before this court as a matter of right in view of the dissent in the Appellate Division, *R. R.* 1:2–1(*b*).

The applicable statutory provision is as follows:

"2*A*:152–7. *Whenever any money*, currency or cash *shall be seized* or captured by the police, constabulary or other officer *in connection with any arrest for violation of or conspiracy to violate any gambling law of this state, the said money*, currency or cash *shall be deemed prima facie to be contraband of law as a gambling device, or as part of a gambling operation,* and it shall be unlawful to return the said money, currency or cash to the person or persons claiming to own the same, or to any other person, except in the circumstances and manner hereinafter provided." (Italics supplied.)

■ (1) It is apparent that *N. J. S.* 2*A*:152–7 is applicable since clearly the moneys were seized by the police "in connection with any arrest for violation of or conspiracy to violate any gambling law of this state." The trial court was

in error in concluding that to bring this particular section of the statute into play there had to be an arrest of the particular persons in possession of the money seized for violation of a New Jersey statute as distinguished from a municipal ordinance. First of all, the statute refers to "any arrest" so the apprehension of the four operators of the game for violation of *N. J. S.* 2A:112–3, a gambling law of this State, makes it applicable to this case. As stated in *State v. Link*, 14 *N. J.* 446, 453 (1954), "the statutory qualifications are complied with if it appears the arrest was in connection with a violation of the gambling law." Secondly, we cannot subscribe to the theory that the statutory words "any gambling law of this state" are to be limited solely to enactments of the State Legislature. Rather the term refers to any lawful enactment covering gambling, regardless of whether it was passed by the Legislature or by a municipality under the powers granted to it by the Legislature, *McGrath v. City of Bayonne*, 85 *N. J. L.* 188, 192 (*E. & A.* 1913); *People v. Ziady*, 8 *Cal.* 2d 149, 64 *P.* 2d 425, 429, 430, 108 *A. L. R.* 1234 (*Sup. Ct.* 1937); *Southern Ry. Co. v. City of Danville*, 175 *Va.* 300, 7 *S. E.* 2d 896, 898 (*Sup. Ct. Apps.* 1940); *Herman v. Mayor and City Council of Baltimore*, 189 *Md.* 191, 55 *A.* 2d 491, 494, 173 *A. L. R.* 1310 (*Ct. Apps.* 1947). Since they were arrested for violation of a municipal ordinance covering gambling, clearly the plaintiffs were arrested "for a violation * * * of a gambling law of this state," within the meaning of *N. J. S.* 2A:152–7.

▮ (2) Under this statute the moneys seized "shall be deemed *prima facie* to be contraband of law as a gambling device, or as part of a gambling operation." The power of the Legislature to provide that certain facts shall be *prima facie* evidence of other facts is too well settled to require discussion by us, and in fact the plaintiffs have not challenged the establishment of this rule of evidence, nor its applicability to the case at bar; see *McNeilly v. State*, 119 *N. J. L.* 237, 241 (*Sup. Ct.* 1937); *State v. Lisena*, 129 *N. J. L.* 569, 572 (*Sup. Ct.* 1943), affirmed 131 *N. J. L.* 39

(*E. & A.* 1943); *Casey v. United States,* 276 *U. S.* 413, 418, 48 *S. Ct.* 373, 72 *L. Ed.* 632, 634 (1928); *Goldberg v. Leuci,* 123 *N. Y. S.* 2d 154 (*Sup. Ct.* 1953); 4 *Wigmore on Evidence,* § 2494; annotation 162 *A. L. R.* 495. In *Spagnuolo v. Bonnet,* 16 *N. J.* 546, 558–559 (1954), we noted the effect of this presumption:

"The intention of the Legislature in making such a declaration is obvious. It was and is to establish a rule of evidence, by a *prima facie* presumption to be used in the trial of the claim of property created by the act. Such presumption places the burden upon the claimant of coming forward with evidence to overthrow it."

See *Goldberg v. Leuci, supra,* 123 *N. Y. S.* 2d 154.

The question, then, is whether the plaintiffs have sustained the burden of proof in overcoming this presumption that the moneys in question were contraband, *i. e.,* constituted an integral part of a gambling operation, or were earmarked or segregated for gambling purposes, *Kenny v. Wachenfeld,* 14 *N. J. Misc.* 322 (*Sup. Ct.* 1936); *Becker v. Farley,* 137 *N. J. L.* 191, 192 (*E. & A.* 1948); *Krug v. Board of Chosen Freeholders,* 3 *N. J. Super.* 22, 25 (*App. Div.* 1949); *State v. Link, supra,* 14 *N. J.* 446, 452, annotation 19 *A. L. R.* 2d 1228.

The plaintiff Pratico testified that when he arrived at the gambling spot he had "about $350" in his possession in ten, five and single bills. He stated that of this amount $250 had been in one of his pockets and had not been "used" for gambling, while in the other pocket he had $100, which had admittedly been used for gambling, of which the amount of $47.04 remained at the time of the arrest after he had incurred losses at the dice table. He admitted that at the time of his arrest when the money was turned over to the police he made no effort to inform the police that only a part of the $297.04 had been used in gambling. His testimony was seriously impaired when on the defendant's case the county prosecutor testified that the plaintiff had all of his money, except for $5, in one pocket, and the chief clerk

in the prosecutor's office who had participated in the raid testified to the same effect.

The plaintiff Lusky testified that of the $205 turned over to the police, $65 was in his left pocket, while the balance, $140, was in his wallet in a rear pocket. He testified that he had not "used" any of the money in his wallet in connection with the dice game but had "used" $50 of the money in his left pocket for gambling purposes, and that the extra $15 represented his winnings. He also admitted that he had failed to inform the police that the money in his wallet had not been used for gambling. On the defendant's case both the county prosecutor and the chief clerk in the prosecutor's office testified that all of the $205 had been in Lusky's right trousers pocket.

The plaintiff Gallione testified that he had ceased gambling some 10 to 15 minutes before the police arrived, although he had remained near the players. He testified that of the $265.01 taken from him by the police, $260 was in his right trousers pocket, while $5 in change was in his coat pocket. He gave no testimony as to the amount he had actually used in the game.

As far as Gallione is concerned, it is obvious that he has failed to sustain the burden of overcoming the *prima facie* presumption that the money taken was an integral part of the gambling operation, or earmarked or segregated for gambling purposes. He did not even contend that any of the money had not been used or intended for use at the dice table. He made no effort to show that the money was not contraband of law, so there was no evidence before the trial court from which a decision in his favor could conceivably have been granted. The mere fact that at the time of the raid he had temporarily withdrawn from active participation in the dice game was insufficient to overcome the presumption that the money was earmarked and segregated for gambling.

As for Pratico and Lusky, their testimony is insufficient to carry the burden of proof with which they are charged.

Although we are reluctant to disturb the findings of fact of a trial court, we believe that in this case it is necessary for us to exercise our powers in this regard, *R. R.* 1:5–4. In *In re Perrone's Estate*, 5 *N. J.* 514, 522 (1950), we rejected the uncontradicted testimony of a witness saying:

"Testimony to be believed must not only proceed from the mouth of a credible witness but must be credible in itself. It must be such as the common experience and observation of mankind can approve as probable in the circumstances."

See also *Spagnuolo v. Bonnet, supra,* 16 *N. J.* 546, 554. The plaintiffs' testimony is not credible. The plaintiffs had traveled many miles to attend an organized gambling operation conducted in the early hours of the morning. They left their own cars in a lot and proceeded to the gambling resort in another car. Involved in the game were 48 players and four professional operators in a special room where the precaution of installing a steel door had been taken in order to prevent, or at least delay, police interference. All this indicates that a game involving considerable sums of money was taking place. The plaintiffs were veteran gamblers who went there for the express purpose of participating in the dice game, and admittedly did participate in the game. Pratico admitted that he brought some $350 with him, Lusky $190, while Gallione had $265.01 in his possession when arrested. The possession of such large sums of money can hardly be explained except on the ground that they were brought for use at the gambling table. The testimony of Pratico and Lusky that they had segregated their gambling money from other funds in their possession was directly contradicted by the testimony of the county prosecutor and the chief clerk of his office. In these circumstances we are unable to attach any degree of credibility to plaintiffs' self-serving declarations. The plaintiffs, moreover, never explained the reason for carrying such large sums of money, and we are not so naive as to believe that those who attend organized dice games conducted by professional gamblers bring with them large amounts of money unless they intend

to use them for gambling purposes. Taking all these facts into consideration, we are justified in making independent findings of fact which result in the conclusion that the plaintiffs have failed to overcome the statutory presumption that the moneys were contraband.

█ Moreover, it is to be observed that even if we were to accept the testimony of Pratico and Lusky as true, there was no proof by either of them that the money was not contraband. Their sole testimony was that only a certain amount of the money in their possession had been "used" in the dice game— in other words, up to the time that the police raided, they had only placed a certain amount of this money into play at the dice table. The test, however, is not whether the money has actually been put into play, but rather whether it has become an integral part of the gaming operation or has been earmarked and segregated for gambling purposes. Mere proof that certain money had not actually been bet up to the time of the raid did not mean that such money was not carried by the plaintiffs for possible use in the game and thus earmarked and segregated for gambling purposes.

In *State v. Link, supra,* 14 *N. J.* 446, 453, we had occasion to deal with these same provisions of *N. J. S.* 2A :152–7. In that case the money seized by the law enforcement authorities was in a recessed wall safe in the basement of the defendant's home. No illegal activities were being conducted there at that time. The defendant, a professional gambler, claimed that the money was not contraband since it was not earmarked or segregated as a part of a gambling operation being conducted on the premises, and that the money was not seized "in connection with any arrest," as required under the statute, since he had already been apprehended prior to the time of the raid. We rejected these arguments saying:

"The statute [*N. J. S.* 2A :152–7 *et seq.*] was enacted to discourage and prevent unlawful gambling, and the courts will not construe an enactment in such fashion as to charge the Legislature with deliberately rendering impotent the clear and unambiguously expressed intention of the whole act. *Grogan v. DeSapio,* 11 *N. J.* 308 (1953).

Assume the defendant, forewarned of an impending raid, flees the jurisdiction and thus escapes, but the authorities, pursuing the search warrant, find abundant and undisputed evidence of extensive gambling, including money required to pay off bets where the wheel of fortune gives a negative answer, plus other customary paraphernalia employed in such operations. Does it mean the fruits of the illicit gambling manipulation become immune from seizure and forfeiture simply because the violator was more nimble of foot than those cloaked with authority who sought to preserve law and order?

Before such a construction could be adopted, the wording would have to be positive, emphatic and unmistakable. A statute will not be construed contrary to the over-all purpose envisioned by the Legislature as it is discerned from the context of the entire mandate, and restrictions or limitations not specifically contained therein will not be added by judicial interpretation, especially if they are prejudicial to the public good.

The statute embodies a rule of evidence formulated to facilitate gambling prosecutions by constituting the money so captured as 'prima facie to be contraband of law as a gambling device,' and its primary purpose is to deter gambling violations. The appellants' construction would culminate in easy and frequent evasions of the enactment adopted; would be a perversion of the legislative intent, and contrary to the usual rule of construction that legislation must be accorded a rational interpretation consistent with its manifest purpose. *Grobart v. Grobart*, 5 *N. J.* 161 (1950) ; *Central R. R. Co. of New Jersey v. Director, Division of Tax Appeals*, 8 *N. J.* 15 (1951).

. Here Link's prior arrest, his undisputed unlawful gambling activities and his subsequent conviction all persuade us the seizure was 'connected' with his arrest for the violation of gambling statutes."

Here, too, we refuse to interpret the statute so as to permit claimants, convicted gamblers, to recover money on their own self-serving statements that at the time of the police raid they had only used a portion of it in their participation in the particular dice game. To do so would be to defeat the legislative purpose. Of course, there must be a connection between the money seized and the gambling operation. However, a mere showing that at the time of the raid and seizure of money certain money had not as yet been put into play does not prove the absence of any such connection.

The judgments entered in the Appellate Division of the Superior Court and in the Passaic County District Court are

reversed and the cause will be remanded for the entry of judgment in favor of the defendant. A judgment dismissing the complaint in the Passaic County District Court will be entered.

*For reversal*—Chief Justice VANDERBILT, and Justices HEHER, WACHENFELD, BURLING, JACOBS and BRENNAN—6.

*For affirmance*—Justice OLIPHANT—1.