37 N.J. Super. 70 (1955)
117 A.2d 33
IN THE MATTER OF THE PROBATE OF THE ALLEGED WILL OF WILLIAM G. BLAKE, DECEASED.
LOUIS J. BEERS, EXECUTOR NAMED, ETC., (PROPONENT), PLAINTIFF-APPELLANT,
v.
FLORENCE E. McCONNELL, NEXT OF KIN OF WILLIAM G. BLAKE, DECEASED (CAVEATRIX), DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued July 5, 1955.
Decided September 21, 1955.
*71 Before Judges FREUND, SMITH and LEYDEN.
*72 Mr. Herman J. Harris argued the cause for the appellant.
Mr. Fremont D. Donley argued the cause for the respondent.
The opinion of the court was delivered by LEYDEN, J.S.C. (temporarily assigned).
This appeal is from the judgment of the Essex County Court, denying probate of the alleged last will and testament of William G. Blake, deceased, upon the ground that the said paper writing was a product of undue influence exercised over the deceased by Louis J. Beers.
Deceased, William G. Blake, a bachelor, died on July 23, 1954, at the age of 66 years, leaving him surviving two nieces, one the caveatrix, and a brother. He had lived alone in a small single room on the third floor of a rooming house at 19 Warren Place, in Newark, for the last 16 years of his life. For 10 or 12 years he had suffered from diabetes mellitus with complications such as gangrene and a "bleeding toe," and one leg had been amputated. His comforts and activities were circumscribed by reason of the disease; he was lonesome and starved for friendship and expressed gratitude for favors and little things done for him, often saying, "No one cares for me because of my condition." During the last year of his life he was confined in hospitals for varying lengths of time on five or six separate occasions, and on July 20, 1954 he suffered an attack and was taken to the City Hospital where he died on July 23 of cerebral vascular accident (diabetes mellitus). He had been employed as an inspector at the Ronson Art Metal Works in Newark, and upon his retirement was employed occasionally as a timekeeper at the Robert Treat Hotel. He executed the alleged last will and testament on June 7, 1954. Louis J. Beers, a counsellor-at-law of this State, the proponent herein, was the scrivener of the will and is named sole beneficiary and executor thereof. The will was executed in the office of the proponent and the attesting witnesses were his grandnephew, Edward J. *73 Beers, Jr., who shared the office with him, and the secretary of an attorney in an adjoining office. The estate is valued at about $17,000.
On July 28, 1954 Florence E. McConnell, a niece of the testator, filed a caveat against the probate of the will upon the grounds of improper execution, lack of testamentary capacity, and undue influence exercised by Beers upon decedent. The trial court found, without hesitation,
"* * * that the decedent, who was ill in mind and body at the time of the execution of the will, was the subject of undue influence; or at least, that the proponent has not rebutted such presumption and that the will should be set aside. * * *"
There was no finding by the trial judge on the question of testamentary capacity, and though caveatrix had no proof of improper execution, formal proof was taken to the court's satisfaction and the will marked as an exhibit. We have reviewed the manner in which the will was executed and agree with the conclusion of the trial judge that the will was properly executed and proved.
On the question of testamentary capacity the case is open, since there was no finding on the point and we assume the trial judge, in making no finding, impliedly determined the deceased possessed testamentary capacity. We have examined the proof on this point and are convinced that the deceased, at the time of the execution of the will, had the capacity requisite to a testamentary disposition of his property. We are therefore left with the remaining question: "Does the proof rebut the conclusion of fact that Beers unduly influenced the decedent in the making of the will?"
Our difficulty is not with the law, but with its application to the facts as presented by the record.
The law touching the subjects of testamentary capacity and undue influence is settled and so well defined we will not attempt to change or vary the carefully considered language used in the precedents concerning the subject matter.
"It is true that competency to execute a will is a presumption of law and that the right of testamentary disposition may be exercised *74 by one of only moderate mentality. Nevertheless a degree of mentality is required. The test of testamentary capacity in this state has been said to be that the testator can comprehend the property he is about to dispose of, the objects of his bounty, the meaning of the business in which he is engaged, the relation of each of these factors to the others and the manner of distribution set forth in the will." In re Heim's Will, 136 N.J. Eq. 138, at page 148 (E. & A. 1944).
"Not all influence is `undue' influence. Persuasion or suggestions or the possession of influence and the opportunity to exert it, will not suffice. It must be such as to destroy the testator's free agency and to constrain him to do what he would not otherwise have done in the disposition of his worldly assets. The coercion or domination exercised to influence the testator may be moral, physical, or mental, or all three, but the coercion exerted upon the testator's mind must be of a degree sufficient to turn the testator from disposing of his property according to his own desires by the substitution of the will of another which he is unable to resist or overcome. * * * Each case of this nature must be governed by the particular facts and circumstances attending the execution of the will and the conduct of the parties who participated in order to determine if the coercion exerted was `undue.'" Gellert v. Livingston, 5 N.J. 65, at page 73 (1950); In re Davis' Will, 14 N.J. 166 (1953).
Since the presumption is that the deceased was of sound mind when he executed the will, the burden of proving undue influence is ordinarily upon the person asserting it and it must be clearly established. Gellert v. Livingston, supra. However, "if a will benefits one who stood in a confidential relationship to the testator and there are additional circumstances of suspicious character, a presumption of undue influence is raised and the burden of proof is shifted to the proponent." The relationship of attorney and client is such a relationship, but that relationship, when it is genuine and sincere, raises no implication of fraud or undue influence. In re Hopper's Estate, 9 N.J. 280 (1952); In re Davis' Will, supra.
"Where undue influence is presumed in testamentary disposition from a relation of trust and confidence the presumption is overcomeable by showing that the gift was well understood, and that no pressure was exercised." In re Bottier's Estate, 106 N.J. Eq. 226 (Prerog. 1930); In re Bartles' Will, 127 N.J. Eq. 472 (E. & A. 1940); In re Hopper's Estate, supra.
*75 The proponent Beers conceded early in the trial below and on the argument here that the presumption of undue influence attached, and the burden of going forward with the proof shifted from the caveatrix to him. Therefore, what we must look for is proof that Beers did not exercise influence, either moral, physical or mental, or all three, upon the decedent's mind to a degree sufficient to destroy his free agency within the definition, supra; in short, that Beers did not substitute his mind and will for that of the decedent by satisfactory and believable evidence and thus offset, overthrow, neutralize or rebut the factual conclusion of undue influence. In re Morrisey's Will, 91 N.J. Eq. 480 (Prerog. 1920); In re Bottier's Estate, supra.
Louis J. Beers is 78 years of age and has practiced law in New Jersey as an attorney and counsellor since 1901. He and Stafford Blake, a relative of decedent, were childhood playmates. About 25 years ago decedent began visiting Mr. Beers at his law office occasionally. They discussed books and other writings, their families and old times. Decedent seemed to enjoy the sociability and his talks with the other occupants of the office and often spoke of Mr. Beers as his friend and of his fondness for him. They did not visit each other at their respective homes, eat together or exchange gifts. There is nothing in the record to indicate any close association, domination or control by Beers over the decedent such as is usually found in cases involving undue influence. In 1947 Mr. Beers was the solicitor for decedent in a partition suit, Blake v. Blake, wherein caveatrix McConnell, as the administratrix of the Blake estate, was defendant. This litigation lasted about two years and the care and management thereof seems to have been under the direction and control of a Mr. Hart, who was associated with Mr. Beers in the practice of law. In October 1949 decedent named Mr. Beers the beneficiary of a $1,000 life insurance policy he received under an employee's group insurance plan while working at Ronson Art Metal Company. The policy was found among his effects after death and the caveatrix knew of it before decedent's passing. The policy is effective and payment thereof to Mr. *76 Beers awaits only submission of proof of death. On June 2, 1954 decedent consulted a lawyer, Mr. John Smyth, whom he had met in a restaurant, about making a will. Mr. Smyth was instructed to draft a will, naming the caveatrix sole beneficiary. The appointment to execute it was made for the next day. Decedent was not sure of caveatrix' middle name so he called her and told her of his intentions. Mr. Smyth did not draft the will because in the morning of June 3 decedent phoned and cancelled the appointment. Prior to June 5 decedent went to the office of Mr. Beers and said he wished to make a will, and "I want very little money spent for my burial because they don't pay any attention to me. I have a bleeding toe and an artificial limb and diabetes and it may be disturbing to them, they don't want anything to do with me. And I want you to draw my will. I want to leave everything to you."
Mr. Beers inquired as to his closest relatives, the objects of his bounty, and his property. The response was that he had a niece and a brother, and money in two bank accounts. Mr. Beers dictated the will in question but he could not remember who transcribed it as he was having secretary difficulties at the time. A date, "5th of June, 1954," was typewritten, but decedent did not appear on that day. He did come to the office on June 7, the date was changed accordingly, and the will executed about 4 P.M. When decedent arrived Mr. Beers was not in his office, but telephoned he would be delayed and gave instructions that decedent should be given the copies of the will to read in the interim. These instructions were carried out by Miss Hayes, one of the attesting witnesses, and the decedent read the will and said to Miss Hayes, "That is fine, that is what I want." Upon the arrival of Mr. Beers the statutory formalities surrounding the due execution of a will were complied with. Mr. Beers asked his grandnephew and Miss Hayes to act as witnesses, to which decedent assented. The decedent then read the will aloud in the presence of the witnesses and Mr. Beers. This unusual procedure made an impression upon the attesting witnesses. Upon the completion of the reading the decedent *77 announced: "This is what I want," and he signed, declared and executed it as his will in their presence. The original will was retained and placed in his safe by Mr. Beers. A conformed copy was put in an envelope bearing the legend, "Will of William G. Blake, original in the office of Louis J. Beers," and given to decedent. He was advised he could have the original any time he wished. No fee was charged for the services.
At the close of the testimony the learned trial judge orally delivered his opinion and decision. In support of his conclusion that proponent had not neutralized or rebutted the presumption he enumerated many of the points he felt were unexplained, confused, contradictory and inconsistent, namely, that Beers drew the will the day decedent consulted him; that he dictated it to a typist whose identity he could not recall, and made no charge for its preparation; that the will was executed in his office and the witnesses were his grandnephew and the secretary of an attorney who had an office in the suite; that there were two other attorneys who had offices in the suite and the witnesses were not informed by Beers that he was to be the beneficiary; that the grandnephew was able to "close his mind when decedent read the will aloud"; that Beers did not suggest decedent reconsider making him the sole beneficiary or that decedent consult some other attorney; that decedent suffered from diabetes and the complications resulting therefrom; that the original will was retained by Beers; that Beers failed to visit proponent during his last illness in the hospital; that Beers denied ever having represented decedent as his attorney.
We feel that these incidents, taken either singly or as a whole, in the circumstances, do not justify the conclusion that the presumption was not neutralized or rebutted. Cf. In re Bartles' Will, supra. Undue influence, to vitiate a will, must be operative at the time the will is executed. In re Raynolds' Estate, 132 N.J. Eq. 141 (Prerog. 1942). True, Beers was forgetful and at times inconsistent in his testimony, a circumstance not unusual for a man of his age. We are familiar with the principle that the findings of the trial court *78 in will contests on the issue of undue influence are entitled to great weight because of the trial court's opportunity of seeing and hearing the witnesses, but nevertheless we are constrained to find that the conclusion of fact of undue influence was overcome by the proof submitted by proponent and his witnesses on the whole case. The long acquaintanceship between proponent and decedent; the fact that decedent voluntarily and without his knowledge made proponent the beneficiary of the $1,000 life insurance certificate five years before the making of the will and did not change the beneficiary although at liberty to do so during that time; that testator felt slighted by his relatives because of his diabetic condition; the proceedings at the execution of the will, including the advance reading by decedent without the presence of proponent, all show that the gift to Beers was well understood by decedent and no pressure exercised. As a matter of fact, there is no direct proof of any undue influence; no showing of any close relationship, domination or control such as was in In re Morrisey's Will, supra; and further, the failure of the testator to revoke the will from June 7 until his death on July 23, although he talked about the making of it with the caveatrix and others, and was advised by them how to revoke it without obtaining the original, dispels the charge of undue influence and indicates a ratification. In re Raynolds' Estate, supra.
We conclude the proof shows the decedent possessed testamentary capacity; that proponent's evidence completely rebutted the presumption of undue influence, and the will should be admitted to probate.
There was reasonable cause for contesting the validity of the will and under R.R. 4:55-7(e) allowance may be made to both proponent and caveatrix to be paid out of the estate. Katz v. Farber, 4 N.J. 333 (1950). We also find that the allowances made were not excessive in the circumstances.
Reversed.
FREUND, J.A.D. (dissenting).
I am constrained to dissent from the conclusions of the majority, both because I am of *79 the opinion that they misconstrued the function of an appellate court and because my view of the facts before the trial court as supplied to us in the printed record differs widely from theirs.
While an appellate court is not bound by the findings of fact made by the trial judge sitting without a jury, it is required to give due regard to the opportunity of the trial court to judge the credibility of witnesses. R.R. 1:5-3. Where there is sharp conflict in the testimony the trial court's findings of fact are entitled to great weight. Every intendment is in favor of the judgment under review which should not be disturbed unless the appellate tribunal is satisfied that the trial court's finding was a mistaken one. McGowan v. Peter Doelger Brewing Co., 10 N.J. Super. 276 (App. Div. 1950); In re Perrone's Estate, 5 N.J. 514 (1950); deVries v. The Evening Journal Ass'n., 9 N.J. 117 (1952).
In Pratico v. Rhodes, 32 N.J. Super. 178 (App. Div. 1954), reversed on other grounds 17 N.J. 328 (1955), it was held that:
"Although the Superior Court, Appellate Division, is empowered to review the evidence relating to facts in cases, particularly where controversial issues are essentially factual, and make its own independent findings, the court is not disposed on appeal to overthrow conclusions of the trier of facts unless it is the court's conviction that such conclusions are so manifestly unsupported by or discordant with competent, relevant and reasonably credible evidence as to offend the interest of justice. * * *"
Nowhere in the majority opinion is it stated that the trial court was mistaken. Indeed, they reverse merely because they come to a different conclusion.
I find more than ample evidence to justify the conclusion of the trial court that the decedent was ill in mind and body, and therefore a fit subject for the exercise of undue influence. The only medical testimony offered by the proponent was that of a psychiatrist who never examined the decedent during his lifetime, but in reply to a hypothetical question stated that *80 in his opinion the decedent knew the objects of his bounty and possessed testamentary capacity at the time the will was executed. Massed against this sole item of medical proof, the caveatrix offered the testimony of the decedent's own doctor who had attended him frequently for more than ten years. His testimony was to the effect that the decedent's conversation was rambling and incoherent, that he was weak-minded, that he felt the world was against him and contemplated suicide, that his general condition deteriorated greatly during the last year of his life. This medical testimony was corroborated, and indeed enlarged, by that of other disinterested witnesses, including the owner of the house in which the decedent had lived for over 16 years, who stated that he had been very eccentric, for several years, that he "had failed terribly. His memory was failing." Moreover, a witness who had seen the decedent frequently during the last few years of his life testified that because of his diabetic condition and his sore foot, he appeared to be somewhat demented. At another point, the same witness testified that the decedent himself had said to him: "My mind is going. I am a physical wreck, I am not going to get better. My mind bothers me." As an example of how erratic the decedent's behavior was, the witness said that the decedent had wanted to take his shoe and sock off in a restaurant in order to show the witness how his toe was bleeding; and that such behavior indicated to him that the man was "mentally unbalanced."
It is significant of the fairly rapid deterioration in the decedent's physical condition that between October 1953 and his death on July 23, 1954, he was hospitalized five times for varying periods of time ranging from three days to six weeks. In his testimony the decedent's physician, Dr. Gennell, stated that while he was hospitalized the decedent was a very difficult patient, a constant source of annoyance to the nurses; that he seemed not to understand what he was told, "repeating the same thing over and over again, asking me the same question over and over again * * *."
In view of the above, in my opinion the findings of the trial court as to the mental and physical condition of the decedent *81 at the time of the execution of the will were amply supported by the evidence.
It is well settled that the presumption is in favor of the validity of a will and he who contests it must clearly establish facts to overcome that presumption. In re Raynolds' Estate, 132 N.J. Eq. 141 (Prerog. 1942), affirmed 133 N.J. Eq. 346 (E. & A. 1943). However, if a will benefits one who stands in a confidential relation to the testator and there are other circumstances of a suspicious character, then a presumption of undue influence is raised and the burden of going forward with the proofs rests upon the proponent. In re Heim's Will, 136 N.J. Eq. 138 (E. & A. 1945); Kuruc v. Kuruc, 23 N.J. Super. 584 (Ch. Div. 1952); 5 N.J. Practice (Clapp, Wills and Administration), § 44, p. 108. The relationship of attorney and client obviously is such a confidential relationship. In re Davis' Will, 14 N.J. 166 (1953).
The former rule was that the fact that the lawyer who drew the will was a legatee was sufficient to raise a presumption of undue influence. In re Sparks' Will, 63 N.J. Eq. 242 (Prerog. 1901). It has been held that slight circumstances were enough to raise the presumption of undue influence in the case of a lawyer-scrivener-legatee. In re Cooper's Will, 75 N.J. Eq. 177 (Prerog. 1909). The mere fact that the attorney who drew the will is also a legatee is not sufficient without more to raise a presumption of undue influence. Waddington v. Buzby, 45 N.J. Eq. 173 (E. & A. 1888); Ward v. Harrison, 97 N.J. Eq. 309 (E. & A. 1925); In re Raynolds' Estate, supra. It is a matter which requires scrutiny by the court. In re Romaine's Will, 113 N.J. Eq. 477 (Prerog. 1933), affirmed 115 N.J. Eq. 172 (E. & A. 1934). Where the presumption is raised, it may be overcome by a showing that the testator had testamentary capacity, understood the terms of the will, and executed it of his own free will. In re Bottier's Will, 106 N.J. Eq. 226 (Prerog. 1930); In re Bartles' Will, 127 N.J. Eq. 472 (E. & A. 1940); In re Hopper, 9 N.J. 280 (1952).
*82 While in the ordinary case, the burden is upon the proponent to prove by a preponderance of the evidence the absence of undue influence, In re Weeks' Estate, 29 N.J. Super. 533 (App. Div. 1954), where the charge is against the attorney who drew the will and who is also the sole beneficiary thereunder, the evidence must be "impeccable" and "convincing." In re Morrisey's Estate, 91 N.J. Eq. 480 (Prerog. 1920); In re Heim's Will, supra.
In the instant matter the proponent's testimony was evasive, inconsistent, conflicting and, in some respects, incredible; it was contradicted not only by the proponent himself, but by the documentary evidence.
On direct examination, Mr. Beers testified as follows:
"Q. Did you ever handle any litigation for him (Mr. Blake)? A. No. I am satisfied that he never had any litigation.
Q. Did you ever handle anything that had to do with the drafting of legal documents for this man, outside of this will? A. No."
Later in his testimony he twice again denied having done any legal work for Blake and, further, when an answer to interrogatories was read to him stating he had never rendered legal services to Blake, he declined to change his answer. However, after there had been testimony by other witnesses that Beers held himself out to represent Blake, specifically in drawing and filing papers on his behalf in a partition suit, he admitted that he had acted as attorney for Blake, saying: "Yes, I recall, my memory is refreshed."
Such refreshment of memory is not surprising in view of five letters written by Beers to Blake dated from April 1943, to January 1949, which were read in evidence. The letters concerned the sale of real estate, execution of a deed and release by Blake, and in one dated February 25, 1948, Beers suggested to Blake that he make a will, although he had previously answered an interrogatory that he had never made such a suggestion.
Moreover, a cancelled check in the amount of $299.12, drawn by Florence E. McConnell, the caveatrix in this action, *83 to the order of Louis J. Beers, attorney, and William G. Blake, was offered in evidence. The check bore the endorsement of Louis J. Beers and William G. Blake, and then, "for deposit only, Louis J. Beers, Attorney." Although importuned as to what the proceeds represented, Mr. Beers failed to explain; he at first said he would look up his records, but never did; and finally he said that he must have given Mr. Blake cash for the check, because he kept money in the office safe in his office  but I think it significant that in such event he failed to get a receipt for the cash disbursed from his office funds.
The question of whether or not Beers represented Blake prior to the execution of the will is to my mind only one of the many singular and perplexing facets of the gem of evasiveness and faulty memory which Mr. Beers presented to the trial judge.
The question of to whom he dictated and who typed the decedent's will, while not in itself of great weight, is typical of his failure to "come clean" on the questions asked of him. Throughout extensive questioning he was unable to state the name of the stenographer to whom he dictated and who typed the will. He mentioned a "Miss O'Brien"; he believed she had typed the will; he explained that he was at that time experiencing secretarial difficulties; but neither during his first examination nor upon his recall for rebuttal did he positively name the person who had taken the will by dictation and afterwards typed it. Further, Beers failed to produce the statement of fees usually rendered by a public stenographer, which would have disclosed who typed the will. Since he could not remember the identity of the stenographer, her most important corroborating testimony was not available, and Beers' own account of the will transaction with Blake stands unsupported.
On the question of whether or not he had expressly interrogated the testator as to the natural objects of his bounty in view of the fact that it had been indicated he was to be the sole beneficiary under the will, Mr. Beers was again evasive  he testified that he had questioned Blake about his *84 family, but in reply to a question about the decedent's brothers, he replied:
"I don't know exactly, but he spoke about a deceased brother. I am telling you all I know. If it is not complete, well, all right, that is the way the record will have to stand * * *"
His testimony discloses that he did not know for a fact whether or not Blake had ever been married, nor whether he had any children.
Beers testified that the decedent visited his office about two or three times a week for about five years before he died, and continued his visits after the execution of the will, presumably until the time of his last hospitalization. However, in controversion of this testimony, Mr. Beers' nephew, who had been in his office since February 1950, testified that he never saw Blake until the early part of 1954 and that between the first occasion upon which he saw him and the execution of the will on June 7, 1954, he saw him approximately five to eight times, but never thereafter.
Also there was testimony by both Beers and his nephew that Beers had promised to try to get Blake into Ivy Hill Home and that he had told Blake he had enough influence to do so.
The majority in its opinion states: "We feel that these incidents, taken either singly or as a whole, in the circumstances, do not justify the conclusion that the presumption was not neutralized or rebutted." The proponent must do more than neutralize the presumption of undue influence; he must overcome it by evidence that is impeccable and convincing. The majority opinion makes no mention of this character of evidence. In my opinion, the evidence offered to rebut the presumption was not clear, impeccable or convincing.
Our courts of last resort have uniformly admonished lawyers who themselves draw wills by which they benefit as legatees. In re Nixon's Will, 136 N.J. Eq. 242 (E. & A. 1945). The admonition stated in In re Davis' Will, supra, merits reiteration:
*85 "Ordinary prudence requires that such a will be drawn by some other lawyer of the testatrix' own choosing, so that any suspicion of undue influence is thereby avoided. Such steps are in conformance with the spirit of Canons 6, 11, of the Canons of Professional Ethics promulgated by this court."
Here, no effort was made by the proponent to remove the suspicion by having another lawyer draw the will. Under the circumstances the decedent was entitled to the benefit of independent counsel of his own choosing. In re Cooper's Will, supra. Such a course was not suggested to the decedent by the proponent and there is no adequate explanation of his failure so to do.
I would affirm the judgment of the trial court.